CARLING BREWING COMPANY,
Incorporated

v.

PHILIP MORRIS INCORPORATED.

Civ. A. No. 10164.

United States District Court
N. D. Georgia,
Atlanta Division.

Nov. 12, 1968.

Haas, Holland, Freeman, Levison & Gibert, Atlanta, Ga., James L. Dooley, William K. West, Jr., Cushman, Darby & Cushman, Washington, D. C., for plaintiff.

Conboy, Hewitt, O'Brien & Boardman, New York City, Edgar A. Neely, Jr., Neely, Freeman & Hawkins, Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

1. Plaintiff, Carling Brewing Company Incorporated, is a Virginia corporation, with a principal place of business at Cleveland, Ohio, and a substantial manufacturing activity at Atlanta, Georgia. Its business is the manufacture and sale of beer and ale products, and it does not contemplate the production of any other product at this time. Plaintiff's principal product, in terms of sales, is a type of beer which plaintiff contends is known as "Black Label".[1]

2. Defendant, Philip Morris Incorporated, is also a Virginia corporation, with a principal place of business at New York, New York. Its primary business is the manufacture and sale of tobacco products, although it manufactures and sells other consumer goods, such as chewing gum and razor blades. Its 1966 Annual Report listed its net sales as $767,-473,120 and its assets as $512,549,000. It ranks fourth in sales in the American cigarette market.

3. This is a suit for alleged infringement of a federally registered trademark, and alleged attendant unfair competition created by the defendant's use of the trademark "BLACK LABEL" as a brand

---

1. Carling Brewing Company is an almost wholly owned subsidiary of Canadian Breweries, Ltd., a Canadian Corporation. A 1967 annual report for the latter company, of which the American subsidiary is a major component, shows net sales of $384,493,000 and total assets of $294,273,288.

name for cigarettes. Jurisdiction is based upon the Trademark Laws of the United States, more particularly upon 28 U.S.C. § 1338, and 15 U.S.C. §§ 1114, 1116, 1119, 1121 and 1125(a).

4. Venue is founded on 28 U.S.C. § 1391(c). Defendant was duly served with process in this District and has made a general appearance herein.

5. This action began on May 24, 1966, when plaintiff alleged that defendant's past and proposed use of the words "BLACK LABEL", as a brand name for a type of cigarette, constituted an infringement of their trademark "Black Label". Plaintiff sought a temporary and permanent injunction against any such use of that mark in connection with tobacco products. Plaintiff also sought damages, an accounting for profits, destruction of all materials possessed by defendant containing the words "BLACK LABEL", attorney's fees, and an injunction against defendant's further processing of its then pending application to the Patent Office for registration of the mark "BLACK LABEL" for cigarettes. Numerous affidavits were submitted by both parties and a full hearing was held on the motion to grant a temporary injunction against this use of "BLACK LABEL" by Philip Morris, and such an injunction was thereafter granted by this court on November 22, 1967. Carling Brewing Company, Inc. v. Philip Morris, Inc., 277 F.Supp. 326 (N.D.Ga.1967).

6. Thereafter the plaintiff submitted further evidence, that was not available at the time of the decision on the motion for preliminary injunction, and then brought on a motion for summary judgment. For the reasons set forth herein, that motion will be granted.

7. Trademark Registration Number 308,966, directed to a mark consisting of the words "BLACK LABEL", was awarded to a predecessor of plaintiff on December 26, 1933 for use on lager beer, under the Trademark Act of February 20, 1905. This registration was assigned to plaintiff, who had it republished under the provisions of Section 12(c) of the Lanham Act and thereafter duly filed the affidavits required under Sections 8 and 15 of that Act (15 U.S.C. §§ 1058(a) and 1065). This registration states on its face: "No claim is made to the exclusive use of a label colored black." In the specimen label filed with the original application in the Patent Office that matured into this registration, the words "BLACK LABEL", in block print, were approximately half the size of the word "CARLING'S" above it and the word "LAGER" below. This trademark registration was renewed on December 6, 1953. The required affidavits of use for this registration were filed on or about May 12, 1965, together with a specimen label. This label shows the words "Black Label" in a large script on a black placard, which is presented on a red field, with the words "CARLING" and "BEER" above and below the words "Black Label" in a print that is approximately one-third to one-fourth as high as the script "l" and "k". This label was used on all of the plaintiff's "Black Label" bottled beer up to the middle of 1968.

8. In addition, plaintiff is the owner of federal Trademark Registration No. 796,521, registered on September 21, 1965. The mark as presented in this registration shows the words "Black Label" in a script, presented on a black placard, surrounded by a series of concentric rectangles with rounded corners. Up to 1968 the cans of "Black Label" beer presented the mark in this form with the addition of the word "BEER" (but not the word "CARLING") below the words "Black Label". This particular arrangement also appears on the cardboard containers used for both canned and bottled beer. This combination ("Black Label" in white and "BEER" in red) appears on a black background bounded by the afore-described rectangles, which are black lines separated by white spaces. The rectangular label in turn appears against a background of red. In most cases where this mark is used, the word "CARLING" is also printed in either

black or white, surrounded by an oval line in the same color, the whole being described as the "Carling racetrack". The "racetrack" usually appears above and to the left of the "Black Label" rectangle. On the whole, the words "Black Label" are the words with the most visual impact in the entire scheme. This registration also stated on its face: "Applicant makes no claim to the exclusive use of a label colored black." In 1968 Carling introduced a slight modification in the presentations of its "Black Label" mark. On both its cans and its bottles the words "Black Label" were presented on a black placard in italic letters rather than in script. The "Carling racetrack" was eliminated, and in the instance of the cans and the labels on the larger bottles of beer, the "racetrack" was replaced by the expression "from Carling", presented in small print below the black placard. As on the previous labels, the words "Black Label" are the words with the greatest visual impact.

9. Carling Brewing Company is one of the larger American brewing companies, with regional breweries producing Black Label beer scattered throughout the United States. Nationally, it is the sixth largest beer producer, and its rank in markets close to its breweries may be even higher. The company's product is also sold in a substantial number of foreign countries.[2] In addition to Black Label beer, Carling also produces, for regional markets within the United States only, Heidelberg beer, Red Cap

ale, and Stag beer. The labels for each of these products contain the Carling "racetrack", either above or above and to the left of the brand name, which is always in substantially larger print.

■ 10. There is a dispute about the conclusions to be drawn as to the degree to which the words "Black Label" alone are recognized as being the name of a brand of beer. Defendant contends that the beer is generally known as "Carling Black Label", while plaintiff contends that it is primarily known as "Black Label" alone. There is no direct evidence by survey or otherwise as to which name is currently accepted by the public as the name of the product. The evidence does show that Carling has made a sustained and expensive advertising effort, amounting to at least 50 million dollars in corporation-sponsored advertising alone in the last five years, to popularize Black Label beer under that name.[3] Additional advertising at the numerous points of sale, sponsored or subsidized by Carling to the extent of 12 million dollars over the same period, has repeated the emphasis on the mark "Black Label". Other advertising by distributors and retailers has been consistent with the Carling policy of emphasizing "Black Label". On the other hand, some retailers have advertised Black Label beer by referring to it only as "Carling's" in their advertisements, or with "Carling" given equal or greater importance than the words "Black Label".[4] The evidence shows that

2. Carling Brewing Company exports Black Label beer directly to a number of countries. In addition, Carling Breweries, Ltd. of Canada, another subsidiary of Canadian Breweries, Ltd., produces Black Label beer for sale in that country, and Beamish and Crawford, Ltd., of Ireland, produces Carling Black Label beer for sale in Ireland. An English associate of Canadian Breweries, Charrington United Breweries, Ltd., produces Carling Black Label for sale in the United Kingdom and also for export.

3. Canadian Breweries, Ltd.'s Annual Report shows some 17 brands produced by the Carling companies in America and Canada. In every one of them, "Car-

ling", when it appears, is clearly subordinated to the brand name, suggesting a deliberate corporate policy. This contrasts with some of the other Canadian subsidiaries of Canadian Breweries which emphasize the name of the minor corporation in one or more of their products.

4. Only the advertisements themselves have been submitted to the court. There has been no testimony on the intent of such retail advertisers. But this type of advertising may support other propositions than the one urged by defendant, which is that the retailers believe the beer is better known as "Carling's". Some of the advertisements subordinating "Black Label" may have been motivated

Carling's national advertising has, over the last ten years, deliberately shifted its emphasis to the words "Black Label" and has subordinated "Carling"—such change in emphasis reflecting the manner wherein the labeling on the beer containers has given increasing emphasis and prominence to the words "Black Label". Therefore, the court finds no inherent conflicts between evidence of past and current advertising practices, or the fact that some local advertisers may advertise Black Label without following Carling's lead in emphasizing the name of the beer rather than the name of the company. The ultimate question is not whether *all* the public know Carling's beer as "Black Label", but whether enough of the public recognize Carling's beer as "Black Label" to give Carling a right to protect that mark alone from an infringing use.

11. The evidence shows that most establishments that sell beer at retail, including so-called package stores, grocery stores, and drug stores, also sell tobacco products, with the limited exception of the package stores in areas where their licenses allow the sale of certain alcoholic beverages only. Further the evidence shows that many retail establishments selling beer for on-premises consumption either use or have available ashtrays and matchbooks bearing the Black Label mark, which have been distributed to the retailers in the course of Carling's publicity activities. Such matchbooks and ashtrays are most commonly used in conjunction with cigarettes of all types and brands.

12. There is evidence that at the time Philip Morris first used the mark in October 1965, there had been two other recent uses of the words "Black Label" as a primary trademark. In one case, it was in use for a hair spray and styling gel that was being sold only to licensed professional beauticians and not to the general public. After negotiations with Carling, the trademark application for this product was amended to so restrict its use to such an application and Carling has agreed that it will not challenge the use of "Black Label" on such a specialized product. A second use was for the words "Black Label" as a registered trademark for certain types of clothing produced by the P. H. Hanes Knitting Company, of Winston-Salem, North Carolina. There is no evidence as to its use in October, 1965, and only the barest evidence that it had ever been used at all, and that only during the month of May, 1965.

13. Beyond these two cases where there was a use of "Black Label", there were three other subsisting registrations of the words "Black Label" as a part of a trademark at the time Philip Morris used it. These were for Johnnie Walker Black Label (a Scotch whiskey), Lanson pere & fils Black Label Champagne, and Yardley's Black Label Cologne.[5]

by a desire to get the biggest print possible on each word so as to fill the space available. Thus, in one ad, "Beer" is much larger than "Carling's", which in turn is larger than "Black Label". In another ad, "Beer" is four times as large as "Carling's Black Label". But the same ad also advertises "Bleach" in print four times as large as "Bright Sail", apparently a particular brand of that commodity, suggesting that the advertising is of a general product, regardless of any brand name. In still another ad, the "Black Label" is subordinated to "Carling" exactly as "White Label", a clear grade indicator, is subordinated to "Philadelphia", a brand of whiskey. This leads one to wonder if the advertiser thought "Black Label" was merely one of a number of different grade marks using this type of nomenclature. In any event, the evidence is, at best, inconclusive as to the intent of the retailers.

5. In the case of Johnnie Walker, "Black Label" is clearly a grade mark, used to distinguish the superior grade from the less expensive Johnnie Walker Red Label. On the main label, "Johnnie Walker" is clearly printed in letters twice as large as the grade mark "Black Label", which is printed in a much less readable Germanic print. On the Lanson champagne label, the word "Lanson" is clearly the visually dominant name for the product. That "Black Label" may be a grade mark in this case is evident from the fact that Lanson's makes other

14. Patent Office records show seven other registrations for the words "Black Label", alone or with other words, all of them dating from the 1923–1937 period, all of which had expired by 1965. There is no evidence of when they were ever used, when they were used, or to what extent.[6]

15. In addition to these formally registered marks, at least five other manufacturers of alcoholic beverages use the words "Black Label" on their label, without apparently having registered them.[7]

16. In addition to these instances where the words "Black Label" appear in the label itself, in one fashion or another, there are at least two other alcoholic beverages which use a label *colored* black to distinguish one grade of their product from another grade.[8]

champagne, which is only described as extra dry or vintage or non-vintage, as the case may be. The only other evidence before the court affirmatively shows that the public does not conceive of Lanson's as "Black Label Champagne." The third product identified as "Yardley Black Label" is a men's aftershave lotion and cologne produced by Yardley & Co., Ltd. A registration was issued for the trademark "Yardley Black Label" on February 4, 1964. A cancellation proceeding against this registration was brought in 1964 by Carling, and this proceeding is still pending with no decisions rendered. Carling has now challenged the use of certain presentations of "Yardley Black Label" wherein (Carling asserts) the words "Black Label" are given a prominence suggesting that this is the brand name of the product. This controversy is, as yet, unresolved.

6. Registrations for the words "Black Label" alone were for malt syrup, musical instrument strings, and spool silk. None of these appear to be mass consumption items. Remaining uses, where other words formed part of the registration, were for a whiskey, a carbonated water, a soft-drink syrup, and for both soft drink ingredients and a soft drink beverage. There is no indication of the details of such use or the subordination of any part of the registered mark to any other part.

7. Gallagher and Burton manufacture a blended whiskey with the words "Black Label" clearly subordinated to "Gallagher and Burton". Since Gallagher and Burton also distribute a "White Label", the words "Black Label" are clearly only a grade mark, identifying their lower proof whiskey. One of three types of port wine imported by Robertson Bros. and Co., Ltd. is characterized as "Robertson's Black Label Ruby Port" on the label. "Robertson's" is the visually dominant name. Diego Rallo & Figli import an Italian wine whose label bears the application "Imported Rallo Black Label". "Rallo" is clearly the visually dominant word on the label. There is some evidence that Robertson's is sold nationwide; there is no evidence as to how widely Rallo's is sold. Louis Cherpin Winery produces a wine which is sold in Southern California under the label "Cherpin California Burgundy" with the words "Black Label" appearing at the top of the label. These words and the color of the label (black) are a grade mark, to distinguish this product from a "White Label" product sold by the same producer. Finally, Medley Distilling Company, a subsidiary of Renfield Importers of New York, produces a blended whiskey known as "Medley Black Label", with "Medley" being the dominant part of the label. This label is black. The "Medley" brand has also been sold under a white colored label, with the words "White Label" subordinated to the "Medley" name, and thus serving to distinguish that grade from other grades of "Medley" whiskey. In the late 1930's Schenley's Distillers Corp. was selling two grades of "Schenley's" brand blended whiskey, one with a black label bearing the words "Black Label", and one with a red label bearing the words "Red Label". In both instances those words were clearly subordinated to the presentation of the "Schenley's" brand name and served to distinguish the respective grades from one another. In any event, neither of these products was sold after about 1950.

8. Jack Daniel's Sour Mash Whiskey, and Evan Williams Sour Mash Whiskey are described, both within the liquor trade and by the buying public in general, as "Jack Daniel's Black Label", as contrasted with "Jack Daniel's Green Label", for instance. Evan Williams is sold, at different proofs, also under both a green and a black colored label. A Hildick brandy is also listed in some wholesale catalogues as "Hildick Black

17. Carling has never objected to the use of the words "Black Label" by any of these parties other than by Yardley, as has been noted. As Carling has consistently taken the position that its trademark rights are directed to the use of the words "Black Label" as a primary trademark or brand name, it has never objected to any third party use of the words "Black Label" as a grade mark. As the P. H. Hanes Knitting Company's use of "Black Label" as a primary trademark was plainly *de minimis*, it is plain that that activity has had no effect upon the singularity of strength of Carling's rights in "Black Label" as a primary trademark. While Carling has agreed to the restricted use of "Black Label" as a primary trademark for a hair spray and styling gel sold to licensed beauticians, such a limited and specialized use could not have any significant effect upon the singularity of the plaintiff's "Black Label" mark in the eyes of the general public, and thus does not dilute the secondary meaning that has been obtained by the extensive use, advertising and promotion of that mark before the general public.

18. Where trademark infringement is alleged, it is ultimately necessary for the plaintiff to show that there may be confusion between the sponsorship of his product and the sponsorship of another product. As a prerequisite to such a showing in this case, it is necessary to show that plaintiff's use of "Black Label" is more than a mere descriptive term. Plaintiff must show that "Black Label" has become identified in the public mind (or at least in the minds of a significant part of the public) with Carling's beer product. If, as here, it has been established that the mark has obtained a secondary meaning, the proprietorship in the mark will be afforded as complete protection as if it

were a "strong" mark at the inception. North American Air Coach Systems, Inc. v. North American Aviation, Inc., 231 F.2d 205, 210 (9th Cir. 1955); Day-Bright Lighting, Inc. v. Sta-Brite Fluorescent Mfg. Co., 308 F.2d 377, 382 (5th Cir. 1962). After weighing all the evidence submitted on this question, and considering the net impact of other uses of the words "Black Label" against the sustained and concentrated effort of Carling to make this mark synonymous with its beer, the court finds that Carling has proved this essential element.

19. The elements involved in Philip Morris' alleged infringement are undisputed. A sale of a small number of cigarettes under the label "BLACK LABEL" was made on October 22, 1965. This was sufficient to qualify Philip Morris' use of that mark for an application for a federal trademark registration. Additional sales under that label were made up to the date of this court's issuance of a preliminary injunction. Apart from the very first sale, all the subsequent sales by Philip Morris were made with actual notice of Carling's claim that its rights in the trademark "Black Label" were being infringed, and of Carling's demand that this usage be terminated and that Philip Morris withdraw its pending application for a trademark registration.

20. On or about November 4, 1965 the defendant's formal application for the registration of the mark "BLACK LABEL" as a trademark for cigarettes was filed in the United States Patent Office. By office action of the Patent Office dated June 27, 1966, the application was rejected. A response to this office action was filed by the defendant with the United States Patent Office on or about December 23, 1966. By further office action mailed January 31, 1967, the refusal to register the mark "BLACK LABEL" for the defendant herein was

---

Label Applejack". It has a black label, which was originally adopted to distinguish this product from another grade of

"Hildick" brandy that was sold with a white label.

made final by the Examiner. The Examiner's final refusal declared:

"The trademark Black Label is very well known for beer and it is not believed proper for a newcomer to start using the mark for such a related product as cigarettes. Most drinkers of Black Label beer, or of course any beer, would be smoking cigarettes as they drink the beer. The two go hand in hand into the same mouth and it is consequently not seen how consumer confusion as to source could be avoided."

That application now stands abandoned.

21. While the various Patent Office decisions referred to are not binding upon this court, they are certainly entitled to the most respectful consideration because of the Patent Office's day-to-day expertise in adjudicating cases wherein the ultimate question decided is the question of "likelihood of confusion" as that term is employed in various parts of the Lanham Act. John Morrell & Co. v. Doyle, 97 F.2d 232 (7th Cir. 1938); Aloe Creme Laboratories, Inc. v. Texas Pharmacal Co., 213 F.Supp. 125 (W.D. Tex.1963), aff'd 335 F.2d 72 (5th Cir. 1964). The fact that the Patent Office does not have jurisdiction to determine whether the use of a mark should be enjoined in no way affects the pertinence and applicability of its decisions on the ultimate question of likelihood of confusion. As pointed out by Assistant Commissioner of Patents Leeds in Ex parte Crown Beverage Corp., 102 U.S.P. Q. 312 (Commr. of Pat. 1954):

"(2) It is true that a court in a trade mark suit determines the right to use and the Patent Office determines the right to register, but it is also true that in determining the right to register, the Patent Office must necessarily pass upon the right to use. The difference between suits in the courts and in the Office lies not in what is passed upon, but in the action taken. The court in disposing of a trade mark suit, performs a judicial act, i. e., it enjoins or refuses to enjoin further use of the involved mark; whereas the Patent Office performs an administrative act, i. e., it registers or refuses to register the involved mark." (at p. 314)

Accordingly, the court recognizes that the Patent Office's rejection of the defendant's application for a federal trademark registration constitutes meaningful support for the court's independent judgment on the question of "likelihood of confusion."

22. A factor in weighing the potential confusion that may be created in the mind of the consumer concerning the sponsorship of BLACK LABEL cigarettes is the general current trend of previously specialized American industries to diversify their activities and to engage in production of different types of products. Among these industries is the tobacco industry. To be sure, the question has usually been phrased as to whether the public will think that the new product with the same trademark is manufactured or produced by the owner of the registered trademark that has been in use. Sterling Drugs, Inc. v. Lincoln Laboratories, Inc., 322 F.2d 968, 972 (7th Cir. 1963). Given the general situation where the public is generally unaware of the specific corporate structure of those whose products it buys, but is aware that corporate diversification, mergers, acquisitions and operation through subsidiaries is a fact of life, it is reasonable to believe that the appearance of "Black Label" on cigarettes could lead to some confusion as to the sponsorship of EITHER or both the cigarettes and the beer. Whether the public concludes (if it really draws a specific conclusion) that plaintiff's Black Label beer may have become connected with Philip Morris, or that Carling may now be putting out cigarettes is immaterial. As the Fifth Circuit Court of Appeals recently noted in Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967), this is a dynamic, developing field of the law, and the court must

consider events in the business world and the public impact of name association.

23. There is no question that plaintiff's trademark is valid. Whether it is worthy of protection depends primarily on the degree to which it may have been diluted by others in the past. The court finds that "Black Label" has acquired such a secondary meaning as applied to Carling's beer product that Carling's right to use that mark should be protected. And although beer and cigarettes are not directly competing products, there is no longer any such requirement as a prerequisite to an injunction against a trademark infringement. Continental Motors Corp. v. Continental Aviation Corp., *supra.*

24. It is this court's conclusion that the defendant's use of the trademark "BLACK LABEL" as a brand name for cigarettes is likely to cause confusion, mistake and deception of those purchasers who are familiar with the plaintiff's long and extensive use of the trademark "Black Label" and widespread advertising and promotion thereof, and who have come to recognize it as a trademark associated with the plaintiff and its product.

25. Each case must be judged on the facts peculiar to it alone, and previous cases on different facts are never controlling in trademark actions. On balance, the court finds that Philip Morris' use of "BLACK LABEL", under all the circumstances involved here, is an infringement on Carling's use of the same mark.

26. The court concludes that if Philip Morris should be allowed to resume the sale of its "BLACK LABEL" brand cigarettes, the damage to Carling, while difficult to *measure,* would nonetheless be irreparable. As noted by the Fifth Circuit:

"It is difficult for the owner of a trademark to prove the amount of his damage or how much of it is caused by the infringement. To authorize preventive relief through the issuance of an injunction proof of actual damage is not necessary, but the likelihood of damage is sufficient." Pure Foods v. Minute Maid Corp., 214 F.2d 792, 797 (5th Cir. 1954).

27. The defendant argues that it has an "untarnished reputation for fair dealing and honesty" and that its products are "noted for their high quality", and on this basis urges that its infringement cannot cause any real or meaningful injury. Granting that the defendant has such a reputation, and that their products have such a quality, the rule remains:

"It is not to be disputed that the plaintiff is not required to put its reputation in defendant's hands, no matter how capable those hands may be." James Burroughs, Ltd. v. Ferrara, 8 Misc.2d 819, 169 N.Y.S.2d 93 (Sup.Ct., N.Y. County 1957).

This rule traces back to Judge Learned Hand's famous pronouncement in Yale Electric Corp. v. Robertson, 26 F.2d 972 (2d Cir. 1928), which affirmed an injunction against the use of the famous YALE lock trademark on flashlights:

"However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. *This is an injury, even though the borrower does not tarnish it,* or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." (At p. 974) (Emphasis added.)

28. Moreover, while it is not disputed that some of the defendant's more popular cigarettes are of a high quality, there is nothing in the record to suggest that *all* of the defendant's products now meet any particular standards, much less that they will in the future. In this respect it is significant that up to the date of the hearing on the plaintiff's motion for preliminary injunction the defendant steadfastly refused to volunteer any information concerning the nature and quality of the "BLACK LABEL" cigarettes that it was planning to produce in larger quantities in the future. The fact that the plaintiff, even in the midst of a lawsuit, was unable to obtain any information about the nature and quality of the cigarettes to be sold under the infringing mark serves to highlight one aspect of the irreparable harm that flows from *any* infringement of a trademark—i. e., the inability of the trademark owner to exercise control over the nature and quality of the goods which are being sold, or are to be sold, under *his* trademark. Discussing this type of damage, Judge Learned Hand held that the injury:

> "* * * is real enough, even when the newcomer has as yet done nothing to tarnish the reputation of the first user. Nobody willingly allows another to masquerade as himself; it is always troublesome, and generally impossible to follow the business practices of such a competitor closely enough to be sure that they are not damaging, and the harm is frequently done before it can be prevented." S. C. Johnson & Son v. Johnson, 116 F.2d 427 (2d Cir. 1940).

The law's continuing concern about the effect of infringement on the reputation of the mark and upon the reputation of its lawful owner, has also been explained in the following terms:

> "His mark is the brand by which his goods can be identified, and when it is used by another the reputation of his mark, and consequently his own business reputation, are placed to that extent beyond his control." Standard Brands v. Smidler, 151 F.2d 34, 37 (2d Cir. 1945).

29. Having concluded that there is no substantial question of fact about the plaintiff's use of its "Black Label" trademark, or the manner wherein it has obtained secondary meaning, and having concluded that there is no substantial question of fact as to the likelihood of confusion and attendant damage to the plaintiff, it is found that this case is now in condition for summary disposition. As recently noted by the Court of Appeals for the Fifth Circuit in an affirmance of the granting of summary judgment in a trademark case:

> "Whether or not the granting of such motions is rarely upheld is not the question; each case must be decided upon its particular facts and in many instances the granting of such judgments have been upheld. See Community of Roquefort v. William Faehndrich, Inc., 303 F.2d 494 (2nd Cir. 1962), National Association of Blue Shield Plans v. United Bankers Life Insurance Company, 362 F.2d 374 (5th Cir. 1966), and cases therein cited."

> \* \* \* \* \* \*

> "But, in the instant case, it appears that the facts in the Record which furnish the bases for the trial judge's conclusions, are not in dispute, and the conclusions from such facts are required as a matter of law." Beef/Eater Restaurants Inc. v. James Burrough Ltd., 398 F.2d 637 (5th Cir. 1968).

30. The plaintiff is now entitled to a permanent injunction against any further use of the trademark "BLACK LABEL" on, or in association with, any tobacco product.

31. As plaintiff has, for purposes of its motion for summary judgment, waived its claims for profits, damages, and attorney's fees, there is no occasion for any accounting.

32. As the defendant's application for a Federal trademark registration of "BLACK LABEL" has been abandoned,

there is no longer any need for any order with regard thereto.

For the written reasons this day assigned, the following order is hereby entered and issued.

## ORDER

It is ordered, adjudged and discreed that the defendant, its agents, officers, employees, and successors, and all those in active concert and participation with it, be and they are hereby permanently enjoined from further acts of distributing or advertising any tobacco products under the trademark "BLACK LABEL", either by sale or gift or in any other manner, and are hereby ordered to destroy forthwith any labels, packages, or other materials or things in its possession which in any way present the trademark "BLACK LABEL" in association with any tobacco product.