**JOHN WALKER & SONS, LTD.,**
**Plaintiff,**

v.

**John W. BETHEA, Defendant.**

**Civ. A. No. 66-526.**

United States District Court
D. South Carolina,
Florence Division.

Sept. 19, 1969.

William H. Blackwell, Wright, Scott, Blackwell & Powers, Florence, S. C., and James L. Kurtz, Mason, Fenwick & Lawrence, Washington, D. C., for plaintiff.

William T. McGowan, Jr., Florence, S. C., and S. Norwood Gasque, Latta, S. C., for defendant.

## AMENDED ORDER

HEMPHILL, District Judge.

This is a civil action based upon unfair competition and trademark in-fringement arising under the Trademark Laws of the United States, 15 U.S.C. § 1051 et seq., and specifically under 15 U.S.C. § 1114 [1]. Plaintiff John Walker & Sons, Ltd., is a blender, bottler and seller of scotch whiskey, enjoying world-wide recognition of its product, which is distributed in many countries. Defendant operates a twenty unit motel under the style of Johnny Walker Motel on Highway 301 near Latta in Dillon County, South Carolina. Plaintiff, alleging trademark infringement and unfair competition, prays that defendant be enjoined from using the words Johnny Walker in connection with his motel enterprise. The matter was heard by the court without a jury on June 2nd and 3rd of 1969. After hearing the testimony, listening to the arguments of counsel and reviewing the entire matter, including exhibits, this court publishes its:

## FINDINGS OF FACT

1. Plaintiff, John Walker & Sons, Ltd., is a limited liability company organized and existing under the laws of the United Kindom, having its principal place of business in London, England. John Walker & Sons, Ltd. was founded in 1820 as a sole proprietorship, was later incorporated and in 1923 became a public company. In 1925, Distillers Company, Ltd., purchased all the ordinary stock and John Walker & Sons became a wholly owned subsidiary of the former company.

2. John Walker & Sons, Ltd., has, since 1820, blended, bottled and sold scotch whiskey. The company distributes its product under the labels, JOHNNIE WALKER Red Label and JOHNNIE WALKER Black Label. The trademark JOHNNIE WALKER is registered in over 150 countries. It has long been used in the United States and was first registered in this country in 1910. In the United States from 1935 to 1960 John Walker & Sons has sold its whiskey under the JOHNNIE WALKER Red Label and JOHNNIE WALKER Black

1. Infra.

Label wherein the words JOHNNIE WALKER were presented in Old English Script. In 1960 the labels were changed so that the words JOHNNIE WALKER were presented in a blocked form, which is currently used. The words Red Label and Black Label which appear on the respective labels continued to be, and today are, presented in Old English Script. Associated with JOHNNIE WALKER Red Label, appearing both upon the bottle and generally in the advertising of that whiskey is the picture of a striding figure, an English gentleman wearing a top hat and monocle and carrying a cane. This figure seems to have been extensively advertised with JOHNNIE WALKER Red Label whiskey and is widely associated by the general public with JOHNNIE WALKER whiskey.

3. JOHNNIE WALKER has been widely advertised and is highly popular in the United States and in South Carolina. It has been extensively advertised in magazines and newspapers and by other promotional methods such as billboards and signs; in connection with sporting events and by various "point of sale" promotional techniques. Johnnie Walker advertisements have appeared in such national publications as Fortune, Look, Esquire, Playboy, Life, Sports Illustrated, Yachting, Boating, Wall Street Journal, Time, Newsweek, and New Yorker. Since 1935 the United States importer of JOHNNIE WALKER whiskey has expended in excess of twenty-six (26) million dollars on advertisement and John Walker & Sons, Ltd., has made advertising contributions in this country of nearly twelve (12) million dollars. During the five-year period between 1963 and 1968 some 5,359,250 cases of scotch, each containing twelve "fifths," were sold in the United States. Approximately 88 percent of the business of John Walker & Sons, Ltd. is export business and sales in the United States comprise in excess of 25 percent of its exports. Thus it is clear that JOHNNIE WALKER scotch is widely advertised and highly popular in the United States. The name JOHNNIE WALKER has become associated by the general public with fine scotch whiskey. The words JOHNNIE WALKER therefore have acquired a "secondary meaning" with the general public, designating the particular type of scotch whiskey sold by John Walker & Sons, Ltd. The words JOHNNIE WALKER are not descriptive of plaintiff's product, but rather represent an arbitrary mark by which the public distinguishes plaintiff's product from like scotch whiskies sold by competitors.

4. The defendant is named John Walker Bethea and is known by his friends as "Johnny Walker Bethea." For all practical purposes "Johnny Walker" is his first name.

The defendant is forty-six years old, married and has three young children. He graduated from high school in 1941 and shortly thereafter entered the Navy, where he served during World War II. Defendant was discharged from the Navy in 1946 and subsequently opened a small retail and wholesale ice cream establishment in Hartsville, South Carolina. At the suggestion of his mother he named it "Johnny Walker Ice Cream." Defendant operated this ice cream business about eleven years. After closing that business he held two jobs during a short period of time before constructing his motel which was opened in March of 1960.

5. Defendant's motel at first consisted of ten units and an office. It occupies four or five acres fronting on U.S. Highway 301 which his mother gave him for the purpose of constructing the motel. The motel site is part of a 60-acre tract which was the Bethea family farm. Since construction of the first ten units, defendant has added an additional ten units, a breezeway and a swimming pool. Defendant lives in a house about a hundred yards behind the motel and operates the business himself with the help of two or three employees and the occasional help of his wife. The motel is located on U.S. Highway 301 which prior to the opening of I-95 was a principal

artery for north-south vehicular traffic. It appears that most of the persons traveling U.S. 301 and most of defendant's patrons are travelers from the northeastern states to the resort areas of Florida. Defendant testified that it was again at the suggestion of his mother that he selected the name "Johnny Walker Motel" for his business. When defendant adopted and used the name "Johnny Walker" for his motel, he was aware that there was a brand of liquor sold under the name JOHNNIE WALKER.

6. Defendant's motel operation is a small family business limited to one location. The extent of his advertising activities is likewise limited. He is listed with the American Automobile Association (AAA) and he distributes to his guests postal cards with a picture of his motel shown thereon and mileage cards giving distances north and south of the motel. His exterior advertising consists of five highway approach signs and one sign located in front of the motel.

These signs were erected contemporaneously with the opening of the motel. The signs were originally comprised of a maroon background with the words "Johnny Walker" presented in Old English Script. In 1963 when the maroon color faded the background was changed to red. Subsequently, in 1965, the body of the sign was again changed from red to black. The Old English Script form of the words "Johnny Walker" has at all times been maintained.

This court finds as a fact there is a likelihood of confusion, mistake, or deception caused by defendant's operating his motel establishment under the style "Johnny Walker Motel." In fact a substantial number of people are likely to associate defendant's motel with plaintiff's product. The public has come to associate the words "JOHNNIE WALKER" with whiskey and more particularly with a famous brand of scotch whiskey which is in fact produced by John Walker & Sons, Ltd. The results of three surveys [2] conducted by the plaintiff

2. Three surveys were conducted by plaintiff—one in Florence, S. C.; one on U. S. Highway No. 301 near Latta, S. C., and one in Washington, D. C. The surveys made in Florence and Washington were conducted under carefully controlled scientific conditions by three prominent statisticians. The surveys conducted in Florence and Washington were 'random sample' surveys. By using precise interviewing techniques and applying the statisticians' scientific formulas and expertise in analyzing the results, these experts can be 95% certain that the surveys conducted in Florence and Washington reflect, within certain narrow limits, the responses that would have been made if the entire population of those two cities had been interviewed. The survey conducted on U. S. Highway No. 301 was not made under ideal "laboratory conditions" because it was impossible to determine exactly what "population" or "group" was being interviewed. The interviewers were instructed to approach people who stopped at Stuckey's and Horne's in cars bearing out-of-state license tags, because it was felt that through travelers comprised the majority of the travelers upon that highway and of defendant's patronage.

The interviewers showed the person being interviewed a picture of one of defendant's signs. The major words on the sign, "Johnny Walker Motel," were shown, but the other words were blocked out. Upon being shown the picture, the interviewee was asked, "What products does this suggest to you?" The results indicate that 22% of those interviewed in Florence, S. C., 53.8% of those interviewed in Washington, D. C. and 60.5% of those interviewed on U. S. Highway No. 301 made an association between the words Johnny Walker Motel and some form of liquor.

It has been suggested that a lower percentage of the people interviewed associated the words Johnny Walker Motel with liquor in Florence, S. C., for a variety of reasons. Included are: that the south is traditionally more influenced by those Protestant denominations which prohibit the use of alcoholic beverages; that the plaintiff's product is one of the more expensive liquors and South Carolina is a comparatively poor region of the nation; that the south is a "bourbon" rather than a "scotch" area. This court believes that all of the above contributed to the differential in the Florence survey. Be that as it may, the

demonstrate that upon viewing a picture of the portion of defendant's sign which contains the words "Johnny Walker Motel" a substantial number of people made the association between the words "Johnny Walker" and liquor. Stated another way, the surveys proved that when shown to a substantial number of people, defendant's sign brought to mind plaintiff's product, whiskey.

These surveys competently and scientifically demonstrate that many people make the association between plaintiff's product and defendant's motel. It is a common practice for hotels and motels to use their name to sell alcoholic beverages under their name. Admiral Ben Bow Inns, Downtowner Motels, Hilton Hotels, Holiday Inns of America, Knott Hotels, Manger Hotels, Sheraton Hotels, and Waldorf-Astoria are several hotels and motels which sell alcoholic beverages under their names. Moreover, it is common knowledge that motels and hotels sell alcoholic beverages upon their premises. Additionally, the public is aware of the present trend for formerly specialized businesses to diversify their activities by entering other fields of endeavor. These factors could lead persons to conclude that plaintiff's whiskey and defendant's motel are somehow associated by causing confusion as to the source of either plaintiff's products or defendant's services.

7. John Walker & Sons first became aware that defendant was operating a motel under the name "Johnny Walker" in September or October of 1964 by a letter from its agent, the Canada Dry Corporation. After becoming aware of the situation, plaintiff decided to take action, and a letter was written to defendant in March of 1966 requesting that he discontinue operating his motel under the style "Johnny Walker Motel." Suit was filed on July 20, 1966. After becoming aware of the situation, plaintiff did not unreasonably delay the institution of proceedings.

## (AND)
## CONCLUSIONS OF LAW

This court has jurisdiction of the parties and the subject of the action. Diversity of citizenship exists as does the requisite amount in controversy.[3] Furthermore the cause of action falls under the statutes of the United States, to wit; the Lanham Act (or Trademark Act), 15 U.S.C. § 1051 et seq.

■■ John Walker & Sons, Ltd., plaintiff, filed a complaint with this court alleging trademark infringement and unfair competition. The law of trademark infringement is a part of and included in the broader law of unfair competition. Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948). A trademark infringement of necessity constitutes unfair competition.

John Walker & Sons, Ltd. is the owner of the trademark JOHNNIE WALKER which was first registered in the United States in 1910. The trademark JOHNNIE WALKER has since been re-registered in conjunction with the Red and Black Label designs and is presently a registered trademark. The ownership has not changed since original registration.

■■■ The pivotal question in trademark infringement cases is whether there is a likelihood of "confusion, mistake or deception" caused by the unauthorized use of one's trademark or a colorable imitation thereof.[4] Actual

---

Florence survey was the least important of the three because few, if any, Florence Citizens could be expected to patronize plaintiff's establishment.

In any case, the survey shows a substantial number of people associate the words Johnny Walker with some form of liquor. This association is due to expenditure of large sums of money by

plaintiff to popularize JOHNNIE WALKER scotch.

3. 28 U.S.C. 1332.

4. The statute sets forth the test. 15 U.S.C.A. § 1114(1) (a):

(1) Any person who shall, without the consent of the registrant—

confusion need not be shown. The only requirement is that there be that degree of similarity which results in a likelihood of confusion in that some of the public may be led to believe that the two products emanate from the same source or are somehow connected. Chemical Corp. of America v. Anheuser-Busch, Inc., 306 F.2d 433, 2 A.L.R.3d 739 (5th) Cir. 1962); Durox Company v. Duron Paint Manufacturing Co., Inc., 320 F.2d 882 (4th Cir. 1963); Dwight S. Williams Co., Inc. v. Lykens Hosiery Mills, Inc., 233 F.2d 398, cert. den'd, 352 U.S. 840, 77 S.Ct. 61, 1 L.Ed.2d 56 (4th Cir. 1956); Standard Brands v. Eastern Shore Canning Co., 172 F.2d 144 (4th Cir. 1949); Beef/Eater Restaurants, Inc. v. James Burrough, Ltd., 398 F.2d 637 (5th Cir. 1968).

■ C. Plaintiff's trademark is JOHNNIE WALKER. Defendant uses Johnny Walker. The difference in spelling is inconsequential. The two marks are for all practical purposes identical. Moreover, defendant has at all times presented the words Johnny Walker on a red or black background which are the two colors of plaintiff's labels. In addition, when defendant erected the signs he used Old English Script, in which plaintiff presented the words JOHNNIE WALKER on its labels at the time. Although plaintiff has changed the lettering of the words JOHNNIE WALKER to a block form, certain other words on its label still appear in Old English Script. To fall within the prohibition of the Lanham Act, the two marks must be confusingly similar. That is, the two marks must be so similar that an ordinary purchaser would be likely to be confused. The test is articulately defined in McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828 (1877), quoted by this circuit in Dwight S. Williams Co., Inc. v. Lykens Hosiery Mills, Inc., supra:

"What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases. All that courts of justice can do, in that regard, is to say that no trader can adopt a trademark so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution are likely to be misled."

The adverse trademarks in the instant case are not merely similar, but practically identical and, as noted above, the resemblance of the two marks is calculated to cause confusion.

■ Defendant earnestly contends that the products do not compete and are so different that there could be no likelihood of confusion or deception. The controlling principles make it clear that the products do not have to be goods of like properties, in direct competition. Again the test is whether there is a reasonable likelihood that the buying public might believe that the two products came from the same source or are somehow connected. Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9th Cir. 1963); Greyhound Corp. v. Rothman, 84 F.Supp. 233 (D.C.Md.1949), aff'd. 175 F.2d 893 (4th Cir. 1949); Standard Brands v. Eastern Shore Canning Co., 172 F.2d 144 (4th Cir. 1949); Chemical Corp. of America v. Anheuser-Busch, Inc., 306 F.2d 433, 2 A.L.R.3d 739 (5th Cir. 1962). In Beef/Eater Restaurants, Inc. v. James Burrough, Ltd., supra, plaintiff's registered trademark was "Beefeater," under which it marketed its product, gin. Thereafter defendant began operation of a restaurant chain. In holding that defendant was guilty of trademark infringement because of the use of the name "Beefeater" in connection with its restaurant operation, the court said (p. 639):

"The public has been, or is likely to be, confused, misled, and deceived by defendants' conduct into the belief

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or

advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

that the defendant through its use of the name 'Beefeater', as aforesaid, has been or is in some way associated, connected with, or sponsored by or approved by the plaintiffs."

\* \* \* \* \* \*

"It is true that appellant operates a restaurant and appellees on the other hand make and vend gin. Both are consumable and it is repeatedly held that the parties need not be in competition and that the goods or services need not be identical. See Continental Motors Corporation v. Continental Aviation Corporation, 375 F.2d 857, 861 (5th Cir. 1967); Fleischmann Distilling Corporation v. Maier Brewing Company, 314 F.2d 149 (9th Cir. 1963); Chemical Corporation of America v. Anheuser-Busch, Inc., 306 F.2d 433 (5th Cir. 1962)."

■ This court concludes that defendant's use of the words Johnny Walker is deceptively similar to plaintiff's trademark JOHNNIE WALKER. The use of the name Johnny Walker in connection with defendant's motel operation is likely to cause confusion among some of the public as to the source of either plaintiff's product or defendant's service by leading them to conclude that there is a connection between the two. Plaintiff has spent substantial sums of money on developing its trademark. Plaintiff and the general public have come to associate the words JOHNNIE WALKER with plaintiff's product as was demonstrated by plaintiff's surveys. Defendant's use of the words Johnny Walker is calculated to cause confusion on the part of the public in regard to the two concerns. Therefore defendant's use of the words Johnny Walker infringes upon plaintiff's trademark.

■ The trademark JOHNNIE WALKER is plaintiff's valuable trademark. The degree of protection which should be afforded a trademark or trade name depends upon the extent to which it has been diluted or used by others in the past and also upon the character of the particular trademark involved. It was shown at trial that the words "Johnny Walker" had been registered as the trade name for several products. There was, however, no showing that these products were still being sold under that trademark. The surveys made by plaintiff indicate that that segment of the public which recognizes the name Johnnie Walker, associates the name with some form of liquor. Therefore evidence does not disclose any dilution of plaintiff's trademark, JOHNNIE WALKER.

■ On the other hand it appears that plaintiff's name or mark is essentially arbitrary and fanciful and has come to suggest to the public the particular product distributed by the plaintiff. Thus it has acquired a secondary meaning. It does not indicate or describe the particular product nor is it a name frequently used in many types of businesses. Plaintiff's trademark is similar to such words as "Black Label," "Aunt Jemima," and "Kodak," which have been held to be arbitrary and fanciful words which had acquired a secondary meaning as applied to particular products and therefore worthy of broad protection. Likewise, the words JOHNNIE WALKER have acquired a fanciful or secondary meaning which has nothing to do with their common meaning. They are the subject of the good will and reputation of plaintiff's business. They are not descriptive words; they do not describe plaintiff's product. Rather they are arbitrary words by which the public distinguishes plaintiff's goods from other goods of the same class. By virtue of the fact that plaintiff's name or mark is an arbitrary or fanciful one which has acquired a strong secondary meaning, suggesting as it does plaintiff's product to the general public, it too is entitled to broad protection. Greyhound Corp. v. Rothman, 84 F. Supp. 233 (D.C.Md.1949); Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407 (2nd Cir. 1917); Carling Brewing Co. v. Philip Morris, Inc., 297 F.Supp. 1330 (N.D.Ga.1968); Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948).

■ It has been held that when a descriptive word used as a trademark or tradeword has acquired a secondary meaning, the courts will afford equitable protection to the party whose use of the word created the secondary meaning. Thus in a case for trademark infringement and unfair competition, where the word has acquired a secondary meaning, the court will afford such relief as the user is entitled to under the cloak of unfair competition. Armstrong Paint and Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495 (2nd Cir. 1962); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2nd Cir. 1956).

Although plaintiff alleged unfair competition as a cause of action in his complaint, it appears that most of the evidence and the thrust of plaintiff's trial brief and proposed findings of fact and conclusions of law are addressed to the question of trademark infringement. The elements of both actions are decidedly similar and the courts often lump them together and discuss them as one cause of action. However, there is a distinction between the two forms of action. It is often said that the law of trademark infringement is part of and included in the broader law of unfair competition. However, the law of trademarks is governed by the federal statutes, while the related law of unfair competition is of common law origins. See Brooks Bros. v. Brooks Clothing of California, Ltd., 60 F.Supp. 442 (S.D. Cal.1945); Scriven v. North, 134 F. 366 (4th Cir. 1904); Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948).

■ J. It is clear that the action for unfair competition does embrace the law of trademark infringement and extend beyond it. Trademark infringement is a statutory action provided for under the Lanham Act (or Trademark Act, 15 U.S.C. § 1051 et seq.), while unfair competition is a somewhat more comprehensive field, developed under the common law. Being an equitable action developed by case law the court has a great deal more flexibility and may consider a wider number of factors in an unfair competition controversy. Possible confusion in the minds of the buying public is at the core of the law of trademark infringement. Likewise, the hallmark of that portion of the law of unfair competition which deals with trademarks is possible confusion as to the source of goods. Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948); Brooks Bros. v. Brooks Clothing of California, Ltd., 60 F.Supp. 442 (D.C.Cal. 1945), aff'd 158 F.2d 798, cert. den'd, 331 U.S. 824, 67 S.Ct. 1315, 91 L.Ed. 1840; Safeway Stores, Inc. v. Safeway Properties, Inc., supra. Additionally, factors bearing on unjust enrichment are frequently considered by the courts in unfair competition controversies. The classic statement of the law of unfair competitition as it relates to trademarks was articulated by Judge Learned Hand in Yale Electric Corp. v. Robertson, 26 F.2d 972 (2nd Cir. 1928) (pp. 973, 974):

"The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject, though it assumes many guises. Therefore it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an ironmonger use his trademark? The law often ignores the nicer sensibilities.

"However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches

for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful."

See also the Fourth Circuit case of Dwight S. Williams Co. v. Lykens Hosiery Mills, supra (233 F.2d pp. 401, 402):

"Although the primary purpose of a trade-mark is to indicate the origin, manufacture and ownership of the article in the mind of the purchasing public, it is usually associated with the quality of the product which it symbolizes. Trade-marks are no longer 'regarded simply as an indicium of a known source', they now 'perform the additional function of an advertising and selling device'.

\* \* \* \* \* \*

"A careful study of the entire record here convinces us that the conduct of Lykens cannot be explained by the long arm of coincidence. On the contrary, we think there was a clear attempt by Lykens 'to get under the umbrella' of Williams. In our view, the use by Lykens of 'Trainman' as contrasted with 'Railroads', the use of a picture of a train by Lykens and the similarity between the Williams package and that of Lykens, lead us to the conclusion that Lykens has both infringed the trade-mark of Williams and has been guilty of unfair competition."

 K. Upon review of the evidence and analyzing defendant's course of conduct, this court is compelled to conclude that defendant is guilty of unfair competition. It is significant that defendant knew of plaintiff's product and trade name when he chose the name for his motel. At that point he had an infinity of names from which to choose[5] while plaintiff was already doing business under its trade name, which it had developed and popularized at great expense. It is significant that defendant chose the words Johnny Walker, which were substantially identical to plaintiff's trademark, and presented them on his signs in a format similar to plaintiff's. As noted above, when defendant began his motel operation he presented the words Johnny Walker in Old English Script, which was the form of lettering used by plaintiff at the time. The background on plaintiff's sign was at first maroon, then, red, and finally black. All the colors which defendant has used for the background of his signs were either the same as or similar to the background of plaintiff's label. All of these factors indicate that defendant's signs were an

---

5. The court in Stork Restaurant v. Sahati gave an excellent analysis of the principle as follows (166 F.2d p. 361):

"This thought that a newcomer has an 'infinity' of other names to choose from without infringing upon a senior appropriation runs through the decisions like a leitmotiv.

"In Florence Mfg. Co. v. J. C. Dowd & Co., supra, 2 Cir., 178 F. at page 75, we find a classical statement of the principle:

'It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.'

"And in Coca-Cola Co. v. Old Dominion Beverage Corporation, supra, 4 Cir., 271 F. at page 604: 'Plaintiff's rights are limited at the most to two words. All the rest of infinity is open to defendant. It will be safe if it puts behind it the temptation to use in any fashion that which belongs to the plaintiff. It has not done so voluntarily, and compulsion must be applied.'"

imitation of plaintiff's labels. The conclusion is inescapable that defendant intended to "trade on" plaintiff's goodwill or "get under the umbrella" of extensive and effective promotional efforts on plaintiff's part. Since defendant's efforts to trade on plaintiff's established trademark are likely to cause confusion in that some of the public might associate plaintiff's product with defendant's service, defendant's conduct constitutes actionable unfair competition upon which injunctive relief may be afforded in order that plaintiff's trademark be protected from dilution.

The facts in the instant case closely parallel those in the case of Carling Brewing Co. v. Philip Morris, Inc., 297 F.Supp. 1330 (N.D.Ga.1968). *Carling*, plaintiff in that case, had been selling its beer under the trade name "Black Label" for some time. It had spent considerable time and money in popularizing Black Label beer when defendant began to market a brand of cigarettes upon which it used the words Black Label as a brand name. The court concluded that there was a likelihood of confusion as to the source of either or both the cigarettes and beer and went on at length to discuss the importance of preserving the integrity of the prior user's reputation, saying (p. 1339):

> "The law's continuing concern about the effect of infringement on the reputation of the mark and upon the reputation of its lawful owner, has also been explained in the following terms:
>
> 'His mark is the brand by which his goods can be identified, and when it is used by another the reputation of his mark, and consequently his own business reputation, are placed to that extent beyond his control. Standard Brands v. Smidler, 151 F.2d 34, 37 (2nd Cir.1945).'"

█ Defendant contends that the plaintiff was guilty of laches. The reason for such contention stems from the fact that the plaintiff charged the defendant with infringement approximately six years after the defendant commenced operation of his motel. The plaintiff can be guilty of laches only when there is undue delay after having knowledge of defendant's use. In this situation, the plaintiff acted to protect its right with reasonable promptness after learning of defendant's use of Johnny Walker. The delay in filing suit by the plaintiff after learning of the defendant's use was not so prolonged and unreasonable that it would be inequitable to preclude the plaintiff from seeking injunctive relief as to defendant's future activities.

█ Moreover, it is well established that laches is not a defense to an injunction in a trademark infringement action. See Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609 (7th Cir. 1965):

> "Mere delay is not sufficient to warrant barring plaintiffs' suit. In Standard Oil of Colorado v. Standard Oil Co., 72 F.2d 524, 527 (10th Cir. 1934) the court stated that 'mere delay is insufficient; it must result in prejudice to the party asserting laches.' If this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay. It is only, however, where the delay is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time that the balance of the equities would favor the knowing infringer." (Citations omitted.)

See also Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888); Rothman v. Greyhound Corp., 175 F.2d 893 (4th Cir.1949); American Hospital Ass'n. v. Bankers Commercial Life Ins. Co., 275 F.Supp. 563 (N.D.Tex.1967).

## ORDER

Accordingly, defendant is enjoined from using the words Johnny Walker in connection with his motel operation.

The court has detailed in this Order, the interpretations of higher courts as to that which constitutes infringement, encroachment and/or unfair competition. This Order applies those directions here and expects defendant to comply.

The defendant is enjoined.

The portions of the prayer of the plaintiff's complaint as follows are granted:

"The defendant, his agents, servants, employees and all persons holding through or under him or in active participation with him who receive actual notice hereof be enjoined and restrained by preliminary and final injunction (15 U.S.C. 1116):

(a) from further acts of trademark infringement and unfair competition arising from the defendant's use of Johnny Walker, or any simulation or imitation thereof;

(b) from using Johnny Walker or any simulation or colorable imitation thereof in connection with any motel and/or motel service, or in connection with the advertising of such motel and/or motel service; and

(c) from doing any act divesting or tending to divest the plaintiff of the goodwill identified with its registered trademark JOHNNIE WALKER;

(d) That the plaintiff may have such other and further relief as the circumstances of the case may require and to this court may seem in accordance with equity (15 U.S.C. 1116).

Each party will bear its own costs.

And it is so ordered.