**LACOSTE ALLIGATOR, S.A., and General Mills, Inc., Plaintiffs,**

v.

**BLUESTEIN'S MEN'S WEAR, INC., Fashion Outlet, Inc., The Clothes Peddler, Inc., ABC Specialties, Incorporated, Stone Manufacturing Co., d/b/a S-Mart, The Turning Point Outlet, Inc., Elvin Floyd doing business at Anderson Jockey Lot Flea Market, L & W Wholesale, Inc. and Various John Does, Defendants.**

Civ. A. No. 82–3025–15.

United States District Court, D. South Carolina, Columbia Division.

July 28, 1983.

John Gregg McMaster, Robert J. Thomas, Columbia, S.C., for plaintiffs.

Barry Krell, Charleston, S.C., George S. Nicholson, Jr., Lexington, S.C., Jack H. Lynn, Donald A. Harper, M. Leonard Ledford, Greenville, S.C., Harry A. Swagart, III, Columbia, S.C., V. Laneil Chapman, Anderson, S.C., Lawrence Hogan, Hendersonville, N.C., for defendants.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION

HAMILTON, District Judge.

On March 15, 1983, the plaintiffs moved for summary judgment against the defendant, Elvin Floyd, on all three counts stated in their Complaint. The plaintiffs moved for a permanent injunction, treble damages, costs, and attorneys fees. In the alternative, the plaintiffs moved for partial summary judgment and a permanent injunction with the amount of damages, costs, and attorneys fees to be determined at trial.

This motion was argued on June 29, 1983. Based upon the pleadings, the first deposition of Elvin Floyd, the affidavits filed with the Complaint, and the applicable law, the Court finds and concludes no genuine issue of fact exists for trial on the issue of liability and that the plaintiffs are entitled to judgment against the defendant Floyd as a matter of law on all three counts. Rule 56 of the Federal Rules of Civil Procedure. The amount of damages, costs, and attorneys fees, however, are to be determined at trial where they shall be the sole issues in question.

## FINDINGS OF FACT

On November 30, 1982, this Court issued an Order to Show Cause, Temporary Restraining Order and Order of Seizure permitting the search and seizure of all items of wearing apparel, labels, and advertising or promotional material in the possession, custody or control of the defendants bearing counterfeit or unauthorized copies of the plaintiffs' registered trademarks. The Temporary Restraining Order was based upon the Complaint and the affidavits of David Woods, Keith J. Myers, Peter A. Cacciaguida and John Gregg McMaster. The seizure order included temporary seizure and examination of all books and records related to the purchase or sale of wearing apparel bearing counterfeit or unauthorized copies of the plaintiffs' trademarks.

On Friday, December 3, 1982, pursuant to the Order of Seizure, 6,714 garments consisting of shirts, sweaters, and jackets were found in the possession and control of Defendant Elvin Floyd bearing counterfeits or imitations of the plaintiffs' trademarks. The goods were seized and turned over to the plaintiffs pursuant to this Court's Order.

On December 6, 1982, this Court issued a Preliminary Injunction upon the consent of all parties prohibiting Elvin Floyd and the other defendants from engaging in activities involving further use of any counterfeit, copies, and colorable imitations of the plaintiffs' registered trademarks. No modifications were made concerning the seizure and possession of the items by the plaintiffs pending trial on the merits.

The Complaint contains three counts against Elvin Floyd and the other defendants. Count I alleges that the defendants have infringed the plaintiffs' trademarks by selling garments bearing counterfeits and imitations of the plaintiffs' trademarks in violation of the federal Trademark Act 15 U.S.C.A. § 1051 *et seq.* (1976), specifically sections 1114, 1115, 1116, 1117, and 1118. Count II alleges that the defendants have knowingly, intentionally, and falsely represented to the trade and the public that merchandise sold by them originates with or has been approved by the plaintiffs, in violation of 15 U.S.C.A. § 1125(a) (1982). Count III alleges that the actions of the defendants constitute common law unfair competition and trademark infringement.

The Court finds that Plaintiff Lacoste Alligator, S.A. is the record owner of several United States Trademark Registrations on the principal register for LACOSTE and "alligator emblem" trademarks for various types of wearing apparel. Plaintiff General Mills, Inc., in addition to being the exclusive United States licensee of the above trademarks, is also the record owner of several United States Trademark Registrations on the principal register for the IZOD trademark for various types of wearing apparel. [See Affidavit of Peter A. Cacciaguida, paragraphs 1–3].

The Court finds that Plaintiffs' IZOD, LACOSTE, and "alligator emblem" trademarks have been advertised and promoted throughout the United States as early as 1950. The plaintiffs have expended considerable effort and money in the advertisement and promotion of their wearing apparel bearing these trademarks. The plaintiffs have placed their trademarks before the public in the media which has resulted in their widespread popularity and public acceptance. The Court finds that plaintiffs' sales in this country since 1964 have exceeded one billion dollars, with approximately half of this amount being generated in the last two years. Such widespread public approval and success clearly provides some indication of the present value and recognition of the plaintiffs' trademarks. [Affidavit, *supra,* paragraphs 5–7]. The Court

finds that the present action constitutes an attempt to stop violators in South Carolina from manufacturing, selling, and distributing wearing apparel bearing counterfeits or imitations of the plaintiffs' trademarks.

## CONCLUSIONS

### *Count 1*

Section 1115 of 15 U.S.C.A. (1982) provides that the plaintiffs' registration of their trademarks on the principal register is prima facie evidence of their exclusive right to use the registered marks in commerce. *Mabs, Inc. v. Piedmont Shirt Co.,* 248 F.Supp. 71, (D.S.C.1965) *aff'd,* 368 F.2d 570 (4th Cir.1966).

Section 1114(1) of the federal Trademark Act, 15 U.S.C.A. (1963), protects trademark owners such as the plaintiffs from counterfeiters and provides in relevant part:

(1) Any person who shall, without the consent of the registrant—

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

■ Defendant Floyd's testimony at his deposition clearly establishes a violation of § 1114(1)(b) and the plaintiffs' trademark rights. Floyd admits that he purchased 10,-000 "alligator" logos with the belief that they were originals or imitations of the

plaintiffs' trademarks. Floyd admits that he personally sewed these logos upon garments which he had purchased to resell, none being purchased from the plaintiffs and none originally bearing the IZOD, LACOSTE, or "alligator" trademarks. Floyd also admits that he sold garments bearing the alligator logo at booths he operated at the Jockey Lot Flea Market in Anderson, South Carolina.

"Q. All right, sir. On October 9, 1982, did you have a number of shirts with the alligator logo on the left breast?

A. I could have.

Q. From time to time have you dealt in the merchandising garments with the Izod logo?

A. I have had that alligator on garments in my spaces numbered 225 through 233.

Q. Where did you buy the garments?

A. I bought the garments from various suppliers of merchandise. Generally, they came by the Jockey Lot with merchandise to sell.

Q. And who are the people that you bought them from?

A. In most cases I don't have names. We simply buy and sell for cash there at the market. There are some people that I do have names of, but generally I buy and sell from people that come through the market there.

Q. All right. Who are the people that you can name?

A. I've bought sweaters from Southeastern Apparel.

[Deposition of Elvin Floyd, page 8, lines 2–20].

Q. What individual did you deal with?

A. I have no idea.

Q. Well, how did you make your buys?

A. From them I went to their wholesale operation, told them what I needed, and I paid them for the merchandise.

[Id., page 9, lines 11–15].

Q. Who are some of the other people that you've bought Izod merchandise from?

A. I have never bought any merchandise that has Izod label in it or that other than told me that it was Izod.

Q. All right. Let's talk about the alligator logo then.

A. Okay.

Q. From whom have you purchased garments with the alligator logo?

A. No, one.

Q. Not even Southeastern Apparel—

A. No.

Q. Did you put the logo on it after you bought it?

A. Yes, I did.

Q. Where did you buy the alligator logos?

A. I bought them at a Anderson Flea Market.

Q. From whom?

A. Pardon?

Q. From whom?

A. From someone that came by with alligators for sale that they told me were a genuine Izod alligators.

Q. That's the Anderson Jockey Lot Flea Market?

A. Yes.

Q. How many of them have you purchased?

A. Ten thousand.

Q. Precisely ten thousand?

A. I bought ten thousand at one time on one deal.

Q. How much did you pay for them?

A. Fifty cents apiece.

Q. Do you still have some?

A. I have some.

Q. How many do you have left?

A. You can scoop it up like this (demonstrating). I can tell you in that sense.

Q. You can hold it in two hands?

A. Yes. I would think that.

[Id., page 10, line 10 through page 11, line 19].

Q. How did you put the logos on the garments?

A. I sewed the garments on—logos on the garments.

Q. How many people did you have working to sew them on?

A. As far as I know, I've done it.

Q. You personally?

A. Yes.

Q. By hand or with machine?

A. Machine.

Q. Is your operation at the Anderson Jockey Lot Flea Market retail, or does it also involve some wholesale sales?

A. My operation is strictly retail. That is not to say that if somebody buys 10 garments I wouldn't give them a quarter off or fifty cents off, but any type of substantial amount off retail, no. I'm strictly—strictly retail.

Q. Now, what did you put the logos on?

A. I don't—

Q. Sweaters?

A. Sweaters, shirts, jackets.

Q. Anything else?

A. Not to my knowledge.

[*Id.,* page 12, line 23 through page 13, line 19].

Q. How did you happen to make this transaction with this individual concerning the 10,000 alligator logos?

A. He approached me at the Flea Market, and he asked if I would be interested in buying any alligators, and I told him that I didn't know; I didn't think so, but I have merchandise that I think is probably their merchandise without an alligator on in or without a label in it. He said, "Well, I've got the alligators for sale. Would you like to buy them?" And I said, "I'm interested." I said, "Are they real alligators?" He said, "Yes, they're genuine alligators. They came from a factory that make Izod merchandise; the alligators are real." And I said, "Well, if you'll guarantee that." He said, "You got my word for it." An I said, "Well, I don't know you." He said, "Well, they're real; you can believe that." So, in turn, I said, "What do you want for them?" And then he quoted me a price of 65¢ for some, and I said, "No, that's too high; I'd prefer a better price." And he said, "Well, I've got 10,000; if you'll take them all, I'll give them to you for 50¢." So I gave him $5,000; he gave me his real alligators.

[*Id.,* page 19, line 24 through page 20, line 20].

Q. How were these alligator logos packaged when you bought them?

A. Jeepers. In cellophane.

Q. In a bag?

A. Yes.

Q. One bag?

A. No. They were in 10 different bags.

Q. Were there exactly a thousand in each bag?

A. The bag I counted had a thousand in it, and I assumed that in the rest.

Q. The guarantee really didn't mean very much if you didn't know the fellow—

A. No.

Q. —that you did business with?

A. No. Based on Izod merchandise I've seen in Belk's and at other places, I believe they're real. Quote, if Belk's is real.

Q. You're talking about the logos?

A. Yes.

Q. Now, the shirts that were seized on December 3 were shirts bearing these logos that you were just speaking of?

A. Yes.

Q. And the garments were purchased from various sources?

A. Yes.

Q. Sweaters, shirts and jackets.

A. Yes.

[*Id.,* page 21, line 15 through page 22, line 16].

Q. Now, the merchandise that you put the alligator logos on, was that sold from Booths 25—excuse me, 225, 227, 229, 231, and 233?

A. Yes.

Q. Was it sold from any of the other booths?

A. Not to my knowledge.

Q. Where did you actually sew the alligators on?

A. In my house.

Q. And where is that?

A. In Harbor Heights at my address as stated.

Q. You gave your address to her, but I didn't—

A. In Ninety Six, South Carolina, a housing development called Harbor Heights on Lake Greenwood.

Q. All right, sir. When you bought these garments, did they have labels in them?

A. I buy garments with and without labels. Whether those particular ones had labels in it, I don't think they did.

Q. If they had labels in them, did you cut them out?

A. No.

[*Id.*, page 25, line 17 through page 26, line 11]."

■ The basic issue in any trademark infringement case under § 1114(1)(b) is whether a likelihood of confusion could exist in the minds of the general public. The test for trademark infringement has been enunciated in the case of *Holiday Inns, Inc. vs. Holiday Inn*, 364 F.Supp. 775, 177 USPQ 640, 646 (D.S.C.1973), *aff'd*, 498 F.2d 1397, 182 USPQ 129 (4th Cir.1974) as follows:

The test for trademark infringement set forth in 15 U.S.C. 1114(1), is whether the use of the accused copy or colorable imitation of the registered mark is 'likely to cause confusion, or to cause mistake, or to deceive.' The test is to be applied with regard to the effect of the marks on an ordinary purchaser having an indefinite recollection of the mark to which he has been exposed on a previous occasion. *Standard Oil Co. (Kentucky) v. Humble Oil & Refining Co.*, 363 F.2d 945, 150 USPQ 312 (5th Cir.1966); *Dwight S. Williams Co., Inc. v. Lykens Hosiery Mills, Inc.*, 233 F.2d 398, 109 USPQ 328 (4th Cir.1956). A side-by-side analysis of the marks is not the proper test. *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.*, 322 F.2d 968, 139 USPQ 31 (7th Cir.1963).

The mere possibility of confusion is not sufficient, *AMP, Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir.1976), a probability of likelihood of confusion must be established. *See also* 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:1 at 36. "A trademark is infringed if use of the allegedly infringing mark is likely to cause confusion or mistake, or to deceive purchasers or users as to the source, endorsement, affiliation or sponsorship of the product." *King Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F.Supp. 1138, 216 USPQ 426 (S.D.Tex. 1982) citing *Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 770 (5th Cir. 1980), *cert. denied*, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980); (additional citations omitted). The issue of likelihood of confusion is analyzed by reference to the product's typical buyer. *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 389 (5th Cir.1977).

■ As to the question of whether a likelihood of confusion would exist in the mind of an ordinary purchaser, the court is of the opinion that no issue of material fact exists to submit to a jury for determination. The conduct and activities of Elvin Floyd clearly constitute an intentional violation of § 1114(1)(b). Floyd's deposition testimony shows that he knowingly and willingly violated § 1114 when he placed the logos he believed were the real thing or good imitations on the garments to be sold in commerce. Such imitation was obviously intended and likely to cause confusion, mistake, or deceit among the trade and the buying public.

■ Section 1114(1) permits the trademark registrant to recover damages and profits against a knowing infringer who intended the imitations to cause confusion, mistake, or deceit. Floyd intended to violate the plaintiffs' trademark rights in this case. But even if express intent on the part of Floyd was absent, Floyd's conduct readily implies an intent to cause confusion, mistake, or deceit by his infringement upon the plaintiffs' trademark rights and the consequent invasion of the plaintiffs' goodwill. *See Atlanta Gas Light Co. v. Roberts*, 388 F.Supp. 1383 (D.S.C.1974); *Exxon Corp. v. Humble Exploration Co., Inc.*, 524 F.Supp. 450 (N.D.Tex.1981); *Waples-Platter Companies v. General Foods Corp.*, 439 F.Supp. 551 (N.D.Tex.1977); *Hemmeter Cigar Co. v. Congress Cigar Co.*, 118 F.2d 64 (6th Cir.1941).

Section 1116 of 15 U.S.C.A. (1982) allows the trademark registrant whose rights have been knowingly and intentionally violated

to obtain injunctive relief to prevent further violations. Section 1117 permits the recovery of the defendant's profits, plaintiffs' damages, costs, and attorneys fees. Section 1117 states the measure of monetary relief:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 [public notice that trademark is registered] and 1114 [intent to cause confusion, mistake, or deceit] of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C.A. § 1117 (1982).

■ In the absence of accurate business records or other proof at this time as to the total number and kind of infringed articles sold, other than those sold to the plaintiffs' investigator, a determination of Elvin Floyd's profits derived from their sale would be premature. A determination of the profits received by Floyd is therefore to be determined at trial. The plaintiffs are therefore entitled to summary judgment against Floyd, including a permanent injunction against future infringing activities.

## Count II
### (False Designations and Representations under 15 U.S.C.A. § 1125)

■ Section 1125(a) of 15 U.S.C.A. (1982) creates a cause of action against persons who make false designations of origin and false descriptions of goods and cause such goods to enter into commerce.

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C.A. § 1125(a) (1982).

The underlying purpose of § 1125 is to prevent unfair competition by enabling producers to differentiate their products from those of others and to protect consumers against deceptive designations of origins of goods. *Invicta Plastics (U.S.A.) Ltd. v. Mego Corp.,* 523 F.Supp. 619 (S.D.N.Y. 1981); *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912 (9th 1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981).

■ As to the question of whether the defendant Floyd violated 15 U.S.C.A. § 1125, the court is of the opinion that

there is no genuine issue of material fact and the plaintiffs are entitled to judgment as a matter of law. Floyd admitted in his deposition testimony that he placed the alligator logos which he believed to be authentic on garments which he purchased from various sources, both known and unknown. [Deposition, *supra,* page 8, lines 6–20; page 10, line 16 through page 11, line 19; page 12, line 23 through page 13, line 5; page 22, lines 4–14]. Floyd admitted selling the infringed articles at the Jockey Lot Flea Market in Anderson, South Carolina. [Deposition, *supra,* page 8, lines 2–9; page 25, lines 17–21]. Floyd's actions constitute falsely representing to the trade and the buying public that the garments he sold bearing the plaintiffs' infringed trademarks originated from or had been approved by the plaintiffs. Floyd knowingly, intentionally, and falsely represented to the buying public that the infringed articles met the high standards of quality maintained by the plaintiffs for their apparel.

Floyd's conduct clearly constitutes a violation of § 1125(a) in that he used false representations and false designations of origin for the goods which he sold. Use of the counterfeit alligator logos on the kinds of garments which the plaintiffs normally sold would obviously be likely to cause confusion or deceive the ordinary consuming public concerning the *source* of the goods. Floyd's intentional and willful intent to create a likelihood of confusion is more than sufficient to make out a § 1125(a) violation. *See Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.,* 537 F.Supp. 587 (D. Puerto Rico 1982); *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 467 F.Supp. 366 (S.D.N.Y. 1979), *aff'd,* 604 F.2d 200 (2nd Cir.1979).

■ A showing of actual intent to confuse or mislead as to the source of origin or designation of the goods is not required to obtain equitable relief under § 1125. Only the likelihood of confusion among the ordinary consuming public need be established. *Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186 (2nd Cir.1980); *Ames Pub. Co. v. Walker Davis Publications, Inc.,* 372 F.Supp. 1 (E.D.Pa.1974); *Parkway Baking*

*Co. v. Freihofer Baking Co.,* 255 F.2d 641 (3rd Cir.1958). Floyd's own testimony indicates that the garments were sold as being that of the plaintiffs thus establishing a likelihood of confusion as to the source of origin or description of the goods.

■ Floyd's violation of § 1125(a) entitles the plaintiffs to a permanent injunction against further false descriptions of origin or representations that the plaintiffs are the source of origin of the goods he sells. Although the plaintiffs' inability to show that Floyd's customers, personally unknown to the Plaintiffs, were *actually* deceived by his false representations of origin prevents them from collecting damages against Floyd under § 1125(a), the likelihood of deceit entitles the plaintiffs to permanent injunctive relief. *Walker-Davis Publications, Inc. v. Penton/IPC, Inc.,* 509 F.Supp. 430 (E.D.Pa.1981); *International Election Systems Corp. v. Shoup,* 452 F.Supp. 684 (E.D.Pa.1978), *aff'd,* 595 F.2d 1212 (3rd Cir.1979); *Skil Corp. v. Rockwell International Corp.,* 375 F.Supp. 777 (N.D. Ill.1974); *Hesmer Foods, Inc. v. Campbell Soup Co.,* 346 F.2d 356 (7th Cir.), *cert. denied,* 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81 (1965).

### Count III
#### (Common Law Unfair Competition and Trademark Infringement)

Judge Hemphill, in the case of *John Walker & Sons, Ltd. v. Bethea,* 305 F.Supp. 1302 (D.S.C.1969), describes the elements required for a cause of action for common law unfair competition and analogizes its relationship to trademark infringement.

The law of trademark infringement is a part of and included in the broader law of unfair competition [citation omitted]. A trademark infringement of necessity constitutes unfair competition.

305 F.Supp. at 1306.

\* \* \* \* \* \*

The elements of both causes of action [trademark infringement and unfair competition] are decidedly similar and the courts often lump them together and dis-

cuss them as one cause of action. However, there is a distinction between the two forms of action. It is often said that the law of trademark infringement is a part of and included in the broader law of unfair competition. However, the law of trademarks is governed by federal statutes, while the related law of unfair competition is of common law origins. [citations omitted].

It is clear that the action for unfair competition does embrace the law of trademark infringement and extend beyond it. Trademark infringement is a statutory action provided for under the Lanham Act (or Trademark Act, 15 U.S.C. § 1051 *et seq.*), while unfair competition is a somewhat more comprehensive field, developed under common law. Being an equitable action developed by case law the court has a great deal more flexibility and may consider a wider number of factors in an unfair competition controversy. Possible confusion in the minds of the buying public is at the core of the law of trademark infringement. Likewise, the hallmark of that portion of the law of unfair competition which deals with trademarks is possible confusion as to the source of goods. [citations omitted].

305 F.Supp. at 1309.

*See also Holiday Inns, Inc. v. Holiday Inn,* 364 F.Supp. at 775.

Judge Hemphill in *Walker* adopts a portion of Judge Learned Hand's opinion in *Yale Electric Corp. v. Robertson,* 26 F.2d 972 (2nd Cir.1928), as the classic statement of the law of unfair competition as it relates to trademarks which reads in relevant part:

His [trademark owner's] mark is his authentic decal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and

creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful.

305 F.Supp. at 1309–1310, *quoting* 26 F.2d 973–4.

The court in *Walker* held that common law unfair competition occurs when the "defendant's efforts to trade on plaintiff's established trademark are likely to cause confusion in that some of the public might associate plaintiff's product with defendant's service." [305 F.Supp. at 1311]. Willful and deliberate infringements to identify with the plaintiff trademark owner and his good will and the likelihood of public confusion as a result have been held to clearly constitute unfair competition. *Holiday Inns, Inc. v. Holiday Inn,* 364 F.Supp. at 775.

Floyd's willful and deliberate attempt to represent his garments to be those of the plaintiffs' constitutes common law unfair competition. The plaintiffs have expended considerable sums of money in making their trademarks known to the public and in establishing a reputation for quality wearing apparel. The results of the plaintiffs' efforts have been public approval, recognition, and acceptance. [Affidavit of Peter A. Cacciaguida, paragraphs 4–8]. Floyd has attempted to pirate the plaintiffs' goodwill and reputation by falsely representing the source of origin of his garments. Floyd has stolen the fruits of the plaintiffs' labor and used the plaintiffs' reputation and goodwill to his own commercial and financial advantages. His deliberate use of the counterfeit alligator logos on the type of garments sold by the plaintiffs is likely to cause confusion among the buying public as to apparel sold by Floyd and genuine IZOD and LACOSTE merchandise.

Floyd's knowing and deliberate misappropriation and diversion of the plaintiffs' property rights in their trademarks, their goodwill, and their business reputation has enabled him to compete unfairly with

the plaintiffs. The plaintiffs are entitled to a permanent injunction preventing Floyd's fraudulent merchandising of goods through devices intended to mislead the buying public. *Lone Ranger v. Cox,* 124 F.2d 650 (4th Cir.1942).

Based upon the above stated findings and conclusions, it is

ORDERED, ADJUDGED AND DECREED that the plaintiffs are hereby granted summary judgment on the issue of liability on all three counts alleged in the Complaint in that Floyd's deposition, the pleadings, the affidavits filed with the Complaint, and the applicable law indicate that no genuine issue of fact exists for trial. As the amount of damages is too indefinite to be fully determined at this point, the amount is to be determined at trial where Floyd's sales and profits shall be the sole issues.

Based upon the foregoing findings and conclusions, it is also

ORDERED, ADJUDGED AND DECREED that:

1. The defendant, Elvin Floyd, his partners, agents, representatives, servants, employees and all persons in active concert, privity or participation with him, who receive actual notice of this Order Granting Summary Judgment by personal service or otherwise, are permanently enjoined from doing, aiding, contributing to, causing or abetting any of the following:

(a) manufacturing, distributing, advertising, promoting, holding for sale or selling wearing apparel bearing or using any counterfeit, copy or colorable imitation or confusingly similar facsimile of the "Alligator", LACOSTE and IZOD trademarks described and defined in the Complaint (hereinafter the "Trademarks");

(b) applying to or using on wearing apparel or using on or in connection with the manufacture, sale, distribution, marketing or promoting thereof, any colorable imitation or confusingly similar facsimile of the Trademarks, or any marks, emblems, logos or terms;

(c) using on or in connection with the sale, distribution, promotion and/or marketing of shirts and/or wearing apparel or on any packaging, cartons, labels, display cards, wrappers, promotional materials or advertising matter of any nature whatsoever, any colorable imitation or confusingly similar facsimile of the Trademarks.