**EXXON CORPORATION, et al., Plaintiffs,**

v.

**HUMBLE EXPLORATION COMPANY, INC., Defendant.**

**Civ. A. No. CA–3–77–0734–J.**

United States District Court, N. D. Texas, Dallas Division.

Sept. 29, 1981.

452

*(2) Without Consent*

*(3) In Commerce*

*(4) In Connection with Goods and Services*

*(5) With Likelihood of Confusion*

*(a) Type of Trademark*

*(b) Similarity of Design*

*(c) Similarity of Products*

*(d) Identity of Retail Outlets*

*(e) Identity of Advertising Media*

*(f) Defendant's Intent*

*(g) Actual Confusion*

B. The Abandonment Defense

C. The Laches and Acquiescence Defense

CONCLUSION

Patrick F. McGowan, Strasburger & Price, Dallas, Tex., David Ehrlich, David Goldberg, Kaye, Scholer, Fierman, Hays & Handler, Vincent F. Bick, Jr., New York City, for plaintiffs.

David Ford Hunt, Jenkens & Gilchrist, Roger C. Clapp, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

MARY LOU ROBINSON, District Judge.

This is an action for injunction against alleged infringement of the Plaintiffs' trademark and trade name "HUMBLE". The action arises under the Federal Trademark (Lanham) Act of 1946, as amended, 15 U.S.C. § 1051, et seq. Jurisdiction of the Court is grounded upon § 39 of the Lanham Act, 15 U.S.C. § 1121.

PARTIES

FACTUAL BACKGROUND

 A. Plaintiffs' Use of "Humble" Before 1973

 B. Plaintiffs' Use of "Humble" After 1973

 C. Defendant's Use of Humble

CLAIMS IN CONTENTION

SUBSTANTIVE LAW

 A. Infringement

 *(1) Reproduction of a Mark*

## PARTIES

Plaintiff, Exxon Corporation, is a New Jersey Corporation and the successor to the Standard Oil Company of New Jersey and its subsidiary, the Humble Oil and Refining Company. Exxon Corporation and its predecessors have been the registered holders of the trademark "HUMBLE" since 1923, and presently hold eleven registrations for variations of that mark, nine of which are incontestable under federal law.

The other three Plaintiffs are wholly owned subsidiaries of Exxon Corporation with their principal place of business in Houston, Texas. Humble Oil and Refining Corporation is a Delaware corporation incorporated in September, 1968. Humble Gas Transmission Company, is a Nevada corporation incorporated in April, 1970. Humble Incorporated is a Delaware corporation incorporated in November, 1972.

The Defendant, Humble Exploration Company, is a Texas corporation incorporated in May, 1974. Humble Exploration Company is engaged in the business of oil and gas exploration in the State of Texas. The Defendant is not affiliated with the Exxon Corporation or its subsidiaries.

The controversy between the parties dates back to November, 1976, when the trademark protection department of Exxon Corporation became aware of the Defend-

ant. On January 11, 1977, trademark counsel for Exxon Corporation notified the Defendant that its trade name, Humble Exploration Company, was an infringement of the Plaintiffs' trademark and trade name "HUMBLE," and demanded that use cease immediately. The Defendant responded by denying the allegation of infringement and refusing to change its corporate name.

The Plaintiffs then filed this action on June 2, 1977, seeking to enjoin the Defendant from use of the word Humble in its corporate name and activity.

## FACTUAL BACKGROUND

### A. Plaintiffs' Use of "Humble" Before 1973

The Plaintiffs' use of "HUMBLE" began over half a century ago with the incorporation of the Humble Oil and Refining Company in Texas. From 1917 through 1959 the Humble Oil and Refining Company engaged in all facets of the petroleum business, including petroleum exploration and marketing, and the wholesale and retail of crude oil and refined petroleum products. The Humble Oil and Refining Company used "HUMBLE" as a trade name and as a trademark and service mark for petroleum products and gasoline service stations. During this forty-year period the Humble Oil and Refining Company spent millions of dollars advertising "HUMBLE" in Texas.

In 1959 the Humble Oil and Refining Company of Texas merged with the Humble Oil and Refining Company of Delaware, the marketing arm of the Standard Oil Company of New Jersey. At the time of the merger the Texas corporation transferred its assets, including its trademarks, service marks, and good will to the Delaware corporation. The Delaware corporation continued to operate in the State of Texas under the name Humble Oil and Refining Company.

In the early 1960's the Humble Oil and Refining Company introduced a new marketing system for its products and services. At each service station across the United States a new primary trademark and trade name was adopted—an oval bearing the mark "ENCO" in the Western states and Texas, an oval bearing the mark "ESSO" in the Eastern states, and an oval bearing the mark "HUMBLE" in Ohio. The mark "HUMBLE" was retained as a secondary trademark and trade name, affixed in bold letters to the outer walls of each service station. The Humble Oil and Refining Company name continued to appear on the company's packaged products along with the regional trademark of the particular area of the sale. "HUMBLE" continued to be used as a national trademark on certain packaged products such as "HUMBLE-THERM," heat transfer oil.

From 1960 through 1972 the Humble Oil and Refining Company grew to be one of the largest integrated oil companies in the United States. By the end of 1972 the Humble Oil and Refining Company had operations in 45 states with assets in excess of five billion dollars, and annual sales in excess of eight billion dollars. Also, by the end of 1972 over 20,000 gasoline service stations were affiliated with Humble Oil and Refining Company, 2,500 of which were in Texas. Between 1960 and 1972 the Humble Oil and Refining Company spent in excess of five million dollars annually on the advertisement of its trademarks and trade names.

In the early 1970's, the Standard Oil Company of New Jersey began searching for a strong national trademark to replace the regional trademarks "ENCO," "ESSO," and "HUMBLE." On November 1, 1972, after extensive research and testing, the Standard Oil Company of New Jersey changed its name to Exxon Corporation. On January 1, 1973, the Humble Oil and Refining Company merged with the Exxon Corporation and adopted the name Exxon Company U.S.A.

A changeover program was launched in late 1972 to transfer the good will associated with the regional trademarks to the trademark and trade name Exxon. Exxon Corporation spent over twelve million dollars advertising its name change. "ENCO," "ESSO," and "HUMBLE" ovals were re-

moved from the service stations across the country and replaced by Exxon signs. All packaged products bearing the old regional trademarks were relabeled before distribution from the refineries. With the exception of the remaining packaged products at the service station level, the changeover was completed by the middle of 1973.

Since January 1, 1973, all of the business formerly conducted by the Humble Oil and Refining Company has been carried on by Exxon Company U.S.A. In 1979 the company spent more than five hundred million dollars on domestic exploration, one hundred fifty million dollars of which was spent in Texas.

### B. Plaintiffs' Use of "Humble" After 1973

Since the adoption of Exxon on January 1, 1973, the Exxon Corporation and its subsidiaries have neither advertised the "HUMBLE" trademark nor operated publicly under that trade name. However, a limited use of "HUMBLE" has been made pursuant to a resolution passed by the board of directors of Humble Oil and Refining Company before the changeover to Exxon.[1] In October of 1973 the marketing division of Exxon Company U.S.A. began soliciting small sales of "HUMBLE" branded products from targeted customers. In 1973 three five-gallon pails of gasoline, totaling $9.28, were sold with the trademark "HUMBLE" affixed over the mark Exxon. No arranged sales of "HUMBLE" branded products were made in 1974. In 1975 the marketing division of Exxon Company U.S.A. solicited sales of "HUMBLE" branded oil in the amount of $57.71, five gallon pails of "HUMBLE" branded gasoline in the amount of $34.35, and "HUMBLE" branded grease in the amount of $48.06. In 1976 sales of "HUMBLE" branded oil were made in the amount of $42.05.

Beginning in the fall of 1977 a more extensive use was made of the "HUMBLE" trademark. At that time Exxon Company U.S.A. began modifying the drumheads of all 55 gallon drums of petroleum products sold for domestic distribution from the Exxon refinery in Baytown, Texas. On each drumhead the trademark "HUMBLE" was stenciled beneath the trademark Exxon. Since September of 1977 over 800,000 drums of petroleum products, totaling more than eighty million dollars have been sold bearing both trademarks.

In addition, after the changeover to Exxon the three Plaintiff subsidiary corporations, Humble Oil and Refining Corporation, Humble Gas Transmission Company, and Humble Incorporated, each retained its Humble trade name.[2] Each corporation functions solely for trade name protection, and to that end each corporation has engaged in the limited sale of bulk gasoline and diesel. The marketing division of Exxon Company U.S.A. solicits sales of bulk products from targeted customers. The products are then shipped from Exxon refineries invoiced under the name of one of the three corporations. Since January 1, 1973, those sales have totaled over $395,000.

### C. Defendant's Use of Humble

The Defendant's use of Humble began with its incorporation in May, 1974. In the beginning the Defendant's business was limited to making investments for friends and clients of its founders in the oil and gas operations conducted by others. In the latter part of 1977 the Defendant began to actively engage in the business of oil and gas exploration. Since then the Defendant has engaged in all facets of the exploration

1. By resolution dated April 12, 1972, the Board of Directors of Humble Oil and Refining Company "RESOLVED, that . . . Humble shall continue to use the "ESSO," "ENCO," and "HUMBLE" names, marks, and designs in circumstances and ways other than as a primary brand name."

2. Humble Gas Transmission was incorporated in April of 1970. Humble Incorporated was incorporated in November of 1972. Both cor- porations functioned solely for trade name protection during the period that "HUMBLE" served as a secondary trade name to the regional trade names "ENCO" and "ESSO." Humble Oil and Refining Corporation, the successor to Noxxe Temporary, Inc., and Exxon, Inc., was incorporated in September of 1968 to protect the future trademark and trade name Exxon.

business, including geological testing, leasing, and drilling for oil and gas, and the marketing of the oil and gas produced to independent oil companies in various states. The Defendant's exploration activity is confined to a geological formation known as the Austin Chalk Trend, which lies beneath five Southeast Texas counties.[3] The Defendant is the most active operator in the Austin Chalk Trend, having drilled over 125 wells. The Defendant maintains a field office in Giddings, Texas, and a home office in Dallas, Texas. The Defendant has 90 employees and an annual payroll of two million dollars.

## CLAIMS IN CONTENTION

The Plaintiffs maintain that the Defendant's trade name Humble Exploration Company is likely to cause confusion with their trademark and trade name "HUMBLE," and that it thus infringes (1) their federal registered trademark "HUMBLE," and its variants, in violation of § 1114(1) of the Lanham Act; (2) their common law trademark "HUMBLE," in violation of § 1125(a) of the Lanham Act; and (3) their common law trade name "HUMBLE" in violation of § 1125(a) of the Lanham Act.

Defendant denies confusion and infringement. It also contends that Plaintiffs have abandoned the trademark and trade name "HUMBLE," and that any claim against Defendant growing out of its use of Humble is barred by laches and acquiescence.

3. The Austin Chalk Trend is currently one of the largest oil producing areas in the State of Texas. The five counties comprising the Austin Chalk Trend are Lee, Washington, Fayette, Bastrop, and Gonzales.

4. 15 U.S.C.A. § 1114 reads in pertinent part:
(1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; shall be liable in a civil action by the registrant for the remedies hereinafter provided.

## SUBSTANTIVE LAW

### A. Infringement

■ The Plaintiffs' allegations of trademark and trade name infringement are grounded on two provisions of the Lanham Act. The complaint for infringement of the federal registered trademark "HUMBLE," and its registered variants, is grounded upon § 1114(1). A cause of action exists under § 1114(1) for infringement of a registered trademark against any person who uses (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, or advertisement of any goods; (5) where such use is likely to cause confusion, or to cause mistake, or deceive.[4] An earlier requirement that the confusion or deception must relate to the "source of origin of such goods or services" has been deleted. Pub.L. 87–772, § 17, 76 Stat. 773 (1962).

■ The Plaintiffs' complaint for infringement of the common law trademark and trade name "HUMBLE" is grounded upon § 1125(a) of the Lanham Act. Section 1125(a) does not specifically create a cause of action for trademark and trade name infringement. Instead, it is broadly worded to proscribe (1) the use of words or symbols; (2) tending to falsely describe or represent; (3) the source of origin; (4) of goods or services; (5) in commerce.[5] By settled interpretation the use of an unregistered trademark can constitute a violation of § 1125(a) where:

5. 15 U.S.C.A. § 1125 reads in pertinent part:
(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, . . . shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

... the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a representation that its goods come from the same source.

*Boston Pro Hockey Assn. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir. 1975) (quoting from *Joshua Meir Co. v. Albany Novelty Mfg. Co.,* 236 F.2d 144, 147 (2d Cir. 1956). Similarly, the unauthorized use of a trade name can constitute a violation of § 1125(a) if that use is likely to cause deception as to the source of origin of goods in commerce. *Ferrara v. Scharf,* 466 F.Supp. 125, 132 (S.D.N.Y.1979).

■ A cause of action under § 1114(1) differs in two respects from a cause of action under § 1125(a). First, a cause of action will not lie under § 1114(a) unless the infringed trademark is registered under federal law. Second, the confusion or deception necessary to establish trademark infringement under § 1114(1) need only relate to sponsorship, whereas the confusion required under § 1125(a) must relate to source of origin. However, with respect to the latter difference, the courts have found in most instances that a finding of confusion under § 1114(1) is sufficient to support a finding of confusion under § 1125(a). *See e. g., Amstar Corp. v. Domino's Pizza,* 615 F.2d 252, 258 (5th Cir. 1980); *Boston Pro Hockey Assn. v. Dallas Cap & Emblem Mfg., Inc., supra,* 1013.

The Plaintiffs' registered trademarks for "HUMBLE" are identical to the common law trademarks upon which they also rely.[6] The dominant and distinctive portion of their common law trade name is also "HUMBLE". Given the identity of trademarks and trade names and the commonality of proof required to establish a violation of § 1114(1) and § 1125(a) a finding of infringement of the federal trademarks under § 1114(1) should also support a finding of infringement of the common law trademarks and trade names under § 1125(a). Therefore, the Court will consider first the Plaintiffs' allegations of trademark infringement under § 1114(a). The Court will note where appropriate any facts which warrant a different result as to the allegations of trademark and trade name infringement under § 1125(a).

### (1) Reproduction of a Mark

### (2) Without Consent

### (3) In Commerce

The Plaintiffs have established the first three elements of a cause of action under § 1114(1). Humble Oil and Refining Company, the predecessor of the Plaintiff, Exxon Company U.S.A., traded for over half a century under the trademark, service mark,

**6.** The Plaintiffs hold valid registrations for the following:

| Trademark | Fed./State | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|
| HUMBLE | Federal | 166,460 | 4/3/1923 | Current |
| HUMBLE | Federal | 751,539 | 6/25/1963 | Incontestable |
| HUMBLE OILS | Federal | 165,844 | 3/20/1963 | Current |
| HUMBLE OVAL Design | Federal | 536,952 | 1/23/1971 | Incontestable |
| HUMBLE OVAL Design | Federal | 539,701 | 3/20/1971 | Incontestable |
| HUMBLE OVAL Design | Federal | 556,875 | 4/1/1971 | Incontestable |
| HUMBLE OVAL Design | Federal | 562,508 | 8/5/1972 | Incontestable |
| HUMBLE THREDLOK (HUMBLE in OVAL) | Federal | 694,112 | 3/8/1960 | Incontestable |
| HUMBLE–WELD | Federal | 706,468 | 11/1/1960 | Incontestable |
| HUMBLE–THERM | Federal | 728,749 | 3/20/1962 | Incontestable |
| HUMBLE–MATIC | Federal | 751,035 | 6/11/1963 | Incontestable |
| HUMBLE | State | 21732 | 2/26/1970 | Current |
| HUMBLE | State | 18575 | 2/26/1975 | Current |

458

and trade name "HUMBLE." Since the changeover to Exxon in 1973, the Plaintiffs have continued to maintain valid federal and state registrations for "HUMBLE." The three Plaintiff subsidiary corporations continue to conduct a limited amount of business under the "HUMBLE" trade name. The Defendant today trades (1) under the identical name Humble; (2) without the consent of the Plaintiffs; and (3) in interstate commerce.

*(4) In Connection with Goods and Services*

The first real area of dispute is whether the Defendant uses the name Humble in connection with goods and services. The Defendant argues that the Court should not find that it uses the name Humble in such a manner because it has never physically applied the name to any good or service. Simply put, the Defendant argues that a violation of the Lanham Act has not occurred because it has used Humble as a trade name only, not as a trademark or service mark.

■ Contrary to the Defendant's argument the law is settled that a trademark can be infringed by the use of a mark solely as the trade name of another. As stated by Judge Hughes of this district in *Drexel Enterprises, Inc. v. Heritage House of Dallas*, 136 U.S.P.Q. 425 (N.D.Tex.1963):

It is unlawful for defendant to use a business identification which includes plaintiffs' name and mark . . . as a prominent part notwithstanding that defendant refrains from applying the term to the goods which it sells and applies instead the name or mark of the true manufacturer. *Id.* at 417.

Other cases holding that the use of a mark as a trade name can violate a trademark include *World Carpet, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971); *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495 (2d Cir. 1962).

■ The evidence shows that an integral part of the Defendant's exploration business consists of the gathering and sale of crude oil at the wellhead and the sale of natural gas shipped from the wellhead by pipeline to independent oil companies. The

Defendant uses the name Humble Exploration Company on signs at the drilling sites, on stationery, bills, letterheads, and leases. The Court finds this use of Humble Exploration Company to be a use made in connection with the sale of crude oil and natural gas. The Court concludes therefore that the fourth element of a § 1114(1) violation has been established.

*(5) Likelihood of Confusion*

■ The last element to be considered by the Court under § 1114(1), the likelihood of confusion, is by far the most complex. Whether or not a likelihood of confusion exists, must be determined from the viewpoint of the general public and without regard to any particular geographic area. *AMP v. Foy*, 540 F.2d 1181, 1186 (4th Cir. 1976); *Tisch Hotels, Inc. v. Americanna Inn*, 350 F.2d 609, 614 n.6 (7th Cir. 1965). The factors to be considered in making the determination are (a) the type of trademark; (b) the similarity of design; (c) the similarity of products; (d) the identity of retail outlets and purchasers; (e) advertising media utilized; (f) the defendant's intent; and (g) actual confusion. *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975).

*(a) Type of Trademark*

■ The Court considers first whether the Plaintiffs' trademark "HUMBLE" is a "strong" or "weak" mark because the strength of a mark is a vital consideration in determining the scope of protection it should be accorded. A mark is weak and entitled to limited protection if it is merely generic or descriptive of the product it represents. A mark that is inventive, by virtue of fanciful name, or arbitrary, by virtue of being non-descriptive as applied, is strong and entitled to great protection. Suggestive marks, which suggest but do not describe the product, fall in between. *Amstar Corp. v. Domino's Pizza, Inc., supra*, at 259; *Waples-Platter v. General Foods Corp.*, 439 F.Supp. 551, 575–76 (N.D.Texas 1977).

A trademark that is descriptive may still be entitled to great protection if, by virtue of the amount of advertising, volume of sales, and length of service, it has acquired a secondary meaning in the mind of the public. For secondary meaning to exist, it is not necessary for the public to be aware of the name of the manufacturer from which a product emanates. It is sufficient that the public is aware that the product comes from a single, though anonymous, source. *Union Carbide v. Ever-Ready, Inc.*, 531 F.2d 366, 379 (7th Cir. 1976); *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 849 (5th Cir. 1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1971).

The Defendant maintains that the Plaintiffs' trademark and trade name "HUMBLE" is merely a descriptive word, meaning modest, and therefore entitled to limited protection. The Court rejects this argument for several reasons. First, nine of the "HUMBLE" trademarks are incontestable trademarks by virtue of compliance with § 1065 of the Lanham Act.[7] Incontestable trademarks are subject to challenge only on the defensive grounds enumerated under § 1115 of the Lanham Act.[8] Under § 1115 it is not a defense that a trademark is merely descriptive and such a defense may not be engrafted on the statute by the Court. *Union Carbide v. Ever-Ready, Inc.*, *supra*, at 377; *John R. Thompson v. Holloway*, 366 F.2d 108, 113 (5th Cir. 1966).

Second, a trademark is descriptive only if it conveys to the public characteristics, functions, qualities, ingredients, or properties of the product it represents. *Flexitized, Inc. v. National Corp.*, 335 F.2d 774 (2d Cir. 1964). Words that are common in linguistic use but which, when used with products they represent, neither suggest nor describe any characteristic of those

---

**7.** § 1065 provides that a trademark registered under the Lanham Act shall become incontestable after five years of continuous use, provided that—

(1) there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register; and

(2) there is no proceeding involving said rights pending in the Patent Office or in a court and not finally disposed of; and

(3) an affidavit is filed with the Commissioner within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and the other matters specified in subsections (1) and (2) of this section; and

(4) no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise.

**8.** The defenses are:

"(1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

(2) That the mark has been abandoned by the registrant; or

(3) That the registered mark is being used, by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services in connection with which the mark is used; or

(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin; or

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter or publication of the registered mark under subsection (c) of section 1062 of this title: *Provided, however*, That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: *Provided, however*, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States."

goods or services are arbitrary and entitled to great protection. *Tisch Hotels, Inc. v. Americanna Inn, Inc., supra*, at 611. It cannot reasonably be argued that the word humble is descriptive of oil companies or the products they sell. The Court concludes that "HUMBLE" is arbitrary as applied and, thus, entitled to great protection.

■ Finally, although a showing of secondary meaning is not necessary to sustain the validity of an arbitrary trademark, the Plaintiffs presented convincing evidence that "HUMBLE" acquired secondary meaning between 1922 and 1973. Such secondary meaning was found by the Pennsylvania District Court in *Humble Oil and Refining Co. v. Humble Leasing Co.*, 146 U.S.P.Q. 717, 721 (E.D.Pa.1965):

> The name "HUMBLE" has over a long period of years, acquired a secondary meaning in respect to a broad variety and range of products and services relating to motoring, and the plaintiff and its products and services in such fields have become and now are widely recognized by the trademark, service mark, and trade name "HUMBLE."

While the lack of public marketing and advertisement of "HUMBLE" over the past eight years could have reduced the secondary meaning formerly attached to "HUMBLE," the Court does not believe that this period of inactivity has dissipated the good will created by half a century of extensive use. Thus, even if the Court found the "HUMBLE" mark to be descriptive, it would still conclude that the trademark, having retained a significant amount of good will, is entitled to the protection traditionally accorded trademarks with secondary meaning.

■ The Defendant also challenges the strength of "HUMBLE" on the ground that it has been weakened by third-party use. It is true that the strength of a trademark can be diminished by extensive third-party use. However, the doctrine only limits the scope of protection to be accorded a trademark outside the sphere of uses to which

the plaintiff has already put its mark. *Amstar Corp. v. Domino's Pizza, Inc., supra*, at 259–260.

■ The evidence does not support a finding that extensive third-party use of the word Humble has occurred. The only evidence offered by the Defendant of third-party use was the pages of a telephone directory listing businesses in Humble, Texas. Moreover, such evidence of third-party use cannot protect the Defendant because, as the following section on similarity of products indicates, its use of Humble cannot be characterized as unrelated to the Plaintiffs' previous use of "HUMBLE."

### (b) Similarity of Design

■ The second factor which must be considered by the Court is similarity of design. Similarity of design is determined on the basis of the total effect of the designation, rather than on a comparison of individual features. *Restatement of Torts* § 729, comment b (1938). However, absolute identity is not necessary to establish infringement. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377 (8th Cir. 1965). In the case of a trademark of recognized distinction, it is the dominant portion of the names which cause confusion, and the addition of second names does not lessen the confusion in the minds of the public. *Alfred Dunhill of London, Inc. v. Kasser Distiller Products Corp.*, 350 F.Supp. 1341 (E.D.Pa.1972), *aff'd mem.*, 480 F.2d 917 (3d Cir. 1973).

■ The trademark "HUMBLE," and its variants, and Humble Exploration Company are similar on their face. Given the notoriety of "HUMBLE" between 1922 and 1973, and the residual good will today, the additional words "Exploration Company" are not sufficient to differentiate the companies in the mind of the public. To the contrary, the connotations of the word "exploration" make confusion of the companies more likely.[9]

---

**9.** The evidence also shows that employees of the Defendant often refer to the Defendant as Humble. This abbreviated reference renders the trade name identical to "HUMBLE."

### (c) Similarity of Products

The third factor to be considered by the Court is the similarity of products sold by the parties. The Defendant acknowledges that the Plaintiffs are engaged in activity identical to that formerly conducted by the Humble Oil and Refining Company. The Defendant contends, however, that confusion is unlikely because the Plaintiffs no longer use "HUMBLE" in connection with general exploration activities or the sale of crude oil and natural gas.

An analysis of the similarity of products cannot be limited to a strict comparison of the Defendant's use of Humble and the Plaintiff's present use of "HUMBLE." For the Court to engage in such a limited analysis it would have to ignore the fact that the Humble Oil and Refining Company engaged in business identical to that conducted by the Defendant for over half a century, that a large residual good will exists in "HUMBLE" with respect to that business, and that the Plaintiffs, who own that residual good will, are in direct competition with the Defendant today. As recognized by the Trademark Trial and Appeals Board in *Lyon Metal Products, Inc. v. Lyon, Inc.*, 134 U.S.P.Q. 31 (T.T.A.B. 1962), a case denying the registration of a trademark similar to a dormant trademark with recognized residual good will:

> The substantial good will which accrued to the first party [the trademark owner] because of his extensive promotion and use of his mark does not cease immediately upon a decision to discontinue the manufacture and sale of the goods associated with said good will. There is a residual good will in the mark which remains until such time as it can be shown that the purchasing public no longer is reasonably likely to associate the second party's product with the first party. Until that time there is a continuing likelihood of confusion as to source . . . *Id.* at 35.

Thus, notwithstanding the fact that the Plaintiffs presently conduct their exploration business and the sale of crude oil and natural gas under the name Exxon, there remains the likelihood that (1) persons familiar with the changeover to Exxon will confuse the Defendant for a subsidiary of the Plaintiffs; (2) persons unaware of the changeover to Exxon will confuse the Defendant with the old Humble Oil and Refining Company; and (3) persons aware of the changeover to Exxon and the Defendant's independent status will nevertheless subconsciously associate the good will of "HUMBLE" with the Defendant. The Court concludes that as long as this potential for confusion exists, the relevant inquiry should include the business formerly conducted by Humble Oil and Refining Company and continued today by Exxon Company U.S.A.

Moreover, it is settled that the protection accorded a trademark under the Lanham Act is not limited to identical products or direct competition. The dispositive issue is whether the products are so similar that a confusion of sponsorship is likely. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971). The evidence shows that even today the Plaintiffs use "HUMBLE" in connection with the sale of certain refined petroleum products. Substantial similarity exists between this use of "HUMBLE" and the Defendant's present use of Humble.[10]

The Court finds that under either analysis a substantial similarity exists between the Plaintiffs' and Defendant's use of the word humble, and that the Plaintiffs have established the third factor necessary to a finding of likelihood of confusion.

### (d) Identity of Retail Outlets

Closely related to the question of similarity of products is the fourth factor, the identity of retail outlets and purchasers. The Defendant has placed great emphasis

---

**10.** Other courts have held that the exploration aspect of the petroleum business is substantially similar to the marketing of refined petroleum products to warrant a finding of likely confusion. *See Standard Oil Co. of New Mexico, Inc. v. Standard Oil of California*, 56 F.2d 973 (10th Cir. 1932); *Halliburton Co. v. Halliburton Pipe and Steel Co., Inc.*, CA–H–79–1537 (S.D. Tex. 1980).

on the fact that its operations are confined primarily to the Austin Chalk Trend in Texas while the Plaintiffs' operations are national in scope. Consequently, the Defendant argues that a lack of similarity exists in those persons who come into contact with the respective parties. The Defendant concludes that its business is so pervasive in the Austin Chalk Trend that the potential for confusion among purchasers is non-existent.

The evidence does not support these conclusions. The evidence instead shows that the Plaintiffs and Defendant do business with some common purchasers, suppliers, investors, and landowners, both within and outside the Austin Chalk Trend. The evidence also shows some instances of actual confusion among persons within the Austin Chalk Trend. The Court concludes that substantial similarity exists with respect to this fourth factor.

### (e) Identity of Advertising Media

The similarity of advertising media of the parties is limited. With respect to the Defendant, the evidence shows that its advertisement of Humble is limited to signs at drilling and well sites, a sign on its offices in Dallas and Giddings, Texas, bumper stickers, and business headings on stationery, bills, letterheads, and leases. The evidence does show that on one occasion the Defendant sponsored a public service advertisement on a Dallas, Texas, radio station, and that on several occasions magazines and trade publications have printed articles concerning the Defendant's activities in the Austin Chalk Trend.

The evidence shows that the Plaintiffs no longer pursue public advertisement of "HUMBLE" for any purpose other than trademark and trade name protection. The Plaintiffs use "HUMBLE" on the letterheads of purchase orders and invoices of the three subsidiary corporations, and on the 55 gallon drums shipped from the Baytown, Texas, refinery.

The Court concludes that this factor does not substantially contribute to a likelihood of confusion.

### (f) The Defendant's Intent

A defendant's wrongful intent to trade on the trademark or trade name of another is strong evidence that confusion is likely. *Restatement of Torts* § 729, comment f (1938). The Fifth Circuit Court of Appeals has applied this principal in both federal and common law trademark analysis. *Amstar v. Domino's Pizza, supra* 263; *Aetna Casualty & Surety Co. v. Aetna Auto Finance, Inc.*, 123 F.2d 582 (5th Cir. 1941). Where a defendant adopts a mark with full knowledge of the plaintiff's identical or clearly similar mark, the courts have held that intent may be inferred. *See e. g., Masterpiece of Pennsylvania, Inc. v. Consolidated Novelty Co.*, 368 F.Supp. 550, 552–553 (S.D.N.Y.1973).

The controlling shareholder and founder of Humble Exploration Company admits that he was aware of the extensive use made of "HUMBLE" by the Plaintiffs' predecessor, but maintains that at the time of adopting Humble he believed that the Plaintiffs had abandoned the trademark. The founder admits further that his conclusion was not based on the advise of counsel or the result of a trademark search. He offers no plausible explanation why, with an infinity of names to choose from, he chose the trade name Humble.

The circumstances resemble those considered by the Ninth Circuit Court of Appeals in *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). There the plaintiff sought to enjoin the defendant's use of the trademark "BLACK & WHITE" for beer. After observing that the defendant was fully aware of the plaintiff's famous "BLACK & WHITE" trademark for Scotch when it adopted the identical mark for beer, the court stated:

> Without seeking any legal advice these officers simply decided for themselves that there was no relation between Scotch whiskey and beer and decided to go ahead. We cannot conclude but that [the defendant] deliberately adopted the

name knowing that BLACK & WHITE was the name and trademark of [the plaintiff] and they must have done so with some purpose in mind. The only possible purpose could have been to capitalize upon the popularity of the name chosen. This popularity they must have known, would extend to their product because the public would associate the name BLACK & WHITE with something old and reliable and meritorious in the way of alcoholic beverage. *Id.* at 157.

Given the notoriety of "HUMBLE" in the petroleum business and the Defendant's decision to adopt Humble soon after the Plaintiffs' adoption of Exxon, the Court is compelled to conclude that the Defendant adopted Humble for the purpose of appropriating the residual good will attached to "HUMBLE."

### (g) Actual Confusion

The seventh and most compelling factor to be considered by the Court in determining the likelihood of confusion is the evidence of actual confusion. As stated by the Fifth Circuit Court of Appeals in *World Carpets, Inc. v. Dick Littrel's New World Carpets, supra,* at 489:

There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion is necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.

The Plaintiffs' evidence shows several instances of actual confusion. Among those who testified as to confusion of the respective parties were employees of Exxon Company U.S.A. who testified that numerous landowners had inquired whether the Defendant was affiliated with the Plaintiffs, a woman whose parents had negotiated an oil and gas lease with the Defendant, five employees of the Texas Railroad Commission (the agency charged with oil and gas regulation in Texas), and an employee of a consulting firm under contract with the Environmental Protection Agency. The parties stipulated that in one instance a television station in Houston, Texas, broadcast a report of a blowout and fire at one of the Defendant's drilling rigs and referred to the Defendant as a subsidiary of the Plaintiffs. It was also stipulated that in one instance a congressman from Texas forwarded a complaint letter concerning the Defendant to the Plaintiff.

The Plaintiffs' evidence of actual confusion also included a survey entitled Company Awareness and Identification Study. The Plaintiffs' survey purported to measure the level of actual confusion among 1,000 persons of various demographic backgrounds in Texas, specifically, urban and rural landowners from across the state and persons within those groups having oil company connections. Among the 1,000 persons surveyed, the report concludes that 41% of those surveyed believed the Defendant was related to the Plaintiffs or their predecessor. The survey concludes also that an additional 8% showed probable confusion, and an additional 7% showed possible confusion.

The Defendant's controverting evidence consists of the testimony of several of its employees. Each of these witnesses testified that Humble Exploration Company is well known in the Austin Chalk Trend and that they did not believe the company had been confused with the Plaintiffs.[11]

Also the Defendant challenges the Plaintiffs' survey evidence both on the ground that it employs an improper universe and that it is unduly suggestive in its associational inquiries. The Court has carefully examined the format of the survey and the questions asked in light of the controlling law in the Fifth Circuit.[12] While the Court recognizes the potential for error in all sur-

---

11. The Court notes that two of these witnesses stated on cross examination that they had on occasion been asked whether the Defendant was associated with Exxon.

12. *See, Exxon Corp. v. Texas Motor Exchange of Houston,* 628 F.2d 500 (5th Cir. 1980); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252 (5th Cir. 1980); *Holiday Inns, Inc. v. Holiday Out In America,* 481 F.2d 445 (5th Cir. 1973).

veys, it does not find this survey unduly suggestive of a desired result. Moreover, even if the Court were to disregard the survey evidence entirely, the other evidence is sufficient to show actual confusion.

After considering each of the relevant factors the Court concludes that there is a likelihood of confusion of the Defendant's trade name Humble and the Plaintiffs' registered trademark "HUMBLE." The likelihood of confusion relates to both sponsorship as required by § 1114(1) and source of origin as required by § 1125(a).

▪ The Court holds that the Defendant's use of Humble effects an unlawful infringement of the Plaintiffs' registered and common law trademarks "HUMBLE" and its common law trade name Humble.

### B. The Abandonment Defense

The Defendant argues that it cannot be liable for trademark infringement because the Plaintiffs abandoned their rights in "HUMBLE" with the adoption of Exxon in 1973. In support of this argument the Defendant points to the millions of dollars spent by the Plaintiffs to transfer the good will associated with "HUMBLE" and the other regional trademarks to Exxon. The Defendant relies on the limited use made of "HUMBLE" since 1973 as evidence of the abandonment. Finally, the Defendant argues that the limited use of "HUMBLE" for the defensive purpose of trademark protection is not a commercial use sufficient to sustain trademark rights.

▪ Under the common law the legal protection to be accorded a trademark is dependent upon the actual use of the trademark and the good will associated with that

use. *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1917). Consequently, the abandonment of a trademark, through intentional non-use, results in the loss of legal rights in the mark. *Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900); *Best Foods v. Hemphill Packing Co.,* 5 F.2d 355 (D.C.Del.1925). Thus, under the common law the abandonment of a trademark is recognized as an affirmative defense to an action for common law trademark infringement.

The common law defense of abandonment has also been incorporated into the Lanham Act. Section 1115(a) of the Act allows the assertion of any common law legal or equitable defense in an action brought by the holder of a registered trademark.[13] Section 1115(b) further allows the assertion of the abandonment defense in any action involving a trademark incontestable under § 1065 of the Lanham Act.[14]

▪ A trademark is deemed to be abandoned under the Lanham Act "when its use has been discontinued with the intent not to resume." 15 U.S.C. § 1127. As under the common law the burden of proof rests with the defendant, *American Foods, Inc. v. Golden Flakes, Inc.,* 312 F.2d 619, 624 (5th Cir. 1963), and because abandonment is in the nature of a forfeiture of property, strict proof is required. *A-1 Hurricane Fence Co. v. A-1 Hurricane Fence Co., Inc.,* 468 F.Supp. 975, 987 (S.D.Ala.1979). As a matter of proof, § 1127 provides that "intent not to resume [use of a trademark] may be inferred from the circumstances."[15] Section 1127 further provides that "non-use for

---

13. § 1115(a) provides in part: "Any registration . . . of a mark on the principal register . . . shall be admissible in evidence and shall be prima facie evidence of registrant's exclusive right . . . but shall not preclude any opposing party from proving any legal or equitable defense which might have been asserted if the mark had not been registered."

14. § 1115(b) provides in part: "If the right to use the registered trademark has become incontestable . . . the registration shall be conclusive evidence of the registrant's exclusive right

. . . except when one of the following defenses or defects is established:
(2) That the mark has been abandoned by the registrant . . ."

15. § 1127 provides in part: "A mark shall be abandoned—
(b) When its use has been abandoned with intent not to resume. Intent not to resume may be inferred from circumstances. Non-use for two consecutive years shall be prima facie abandonment."

two consecutive years shall be prima facie abandonment." Prima facie abandonment as used in § 1127 is but a rebuttable presumption which can be overcome by evidence of an intent not to relinquish the rights in a trademark. *Saratoga Vichy Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980).

■ The evidence does not support the Defendant's argument that the Plaintiffs intended to abandon "HUMBLE" with the adoption of Exxon in 1973. Instead, the evidence shows that prior to the adoption of Exxon the board of directors of Humble Oil and Refining Company voted to retain "HUMBLE" names, marks, and designs for use in ways other than as a primary brand. The evidence shows that the Exxon Corporation has taken action consistent with that resolution. Numerous periodicals published before the changeover in 1973, disclosed the intent to retain "HUMBLE" to the shareholders and employees of Humble Oil and Refining Company. In 1973 the legal department of Exxon Corporation asserted a trademark and trade name infringement claim against an Oklahoma oil company. Finally, the decision to implement the trademark and trade name protection program evidences an intent not to relinquish "HUMBLE."

Also, contrary to the Defendant's argument, the evidence does not show any continuous period of inactive use which would indicate that the Plaintiffs ever abandoned their desire to protect "HUMBLE." Sales of "HUMBLE" branded products were made from inventories on hand at the time of the changeover during the years 1973 and 1974. In 1975 and 1976 Plaintiffs began arranging special sales of "HUMBLE" branded products. Although these sales totaled less than $200.00, the calculated protective nature of the sales is evidence of an intent not to abandon "HUMBLE." Since 1977 the Plaintiffs have made extensive use of "HUMBLE" as a trademark on all 55 gallon drums of petroleum products shipped from the Baytown, Texas, refinery.

The more difficult question posed by the Defendant is whether the limited use of "HUMBLE" is sufficient to preclude abandonment notwithstanding the Plaintiffs' desire to protect the trademark. It is clear that between the time the inventories of "HUMBLE" branded products were exhausted in 1974 and the filing of this lawsuit, the Plaintiffs' use of "HUMBLE" was devoid of any commercial significance other than trademark protection. It is also clear from the evidence that the Plaintiffs' present use of "HUMBLE" sales, while significant in volume, is made solely for defensive purposes. The question therefore is whether this limited use is sufficient to protect trademark rights in "HUMBLE." Stated differently, is the limited use of a famous trademark solely for protective purposes a use sufficient to preclude abandonment under the common law and the Lanham Act?

■ The right to exclusive use of a trademark derives from its appropriation and subsequent use in the market place. Thus, to acquire protectable rights in a trademark there must be "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *New England Duplicating Co. v. Mendes*, 190 F.2d 415, 418 (1st Cir. 1951). Similarly, to maintain trademark rights once created, there must be use of the trademark sufficient to identify the source of the product upon which the trademark is used and the good will of the manufacturer or merchant. *Guiding Eyes for Blind v. Guide Dog Foundation for Blind*, 384 F.2d 1016 (C.C.P.A.1967); *Anvil Brands v. Consolidated Foods Corp.*, 464 F.Supp. 474 (S.D.N.Y.1978).

■ A contracted or limited use of a trademark does not necessarily result in the loss of trademark rights. Even a single use of a trademark may be sufficient to protect rights if that use is made in good faith. *Carter-Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970). Determining what constitutes good faith use can only be determined on a case by case basis and the balance of the equities play an important role in deciding whether a partic-

466

ular use is sufficient. *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1204 (S.D.N.Y.1979). Sham transactions designed merely to satisfy the trademark laws are not acceptable. *Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433 (2d Cir. 1974).

The courts have been increasingly reluctant to recognize rights in a trademark where only token use has been made for the sole purpose of reserving the trademark. The leading case is *La Societe Anonyme des Parfums Le Galion v. Jean Patau, Inc.*, (the *Snob* case), 495 F.2d 1265 (2d Cir. 1974). There a French perfume manufacturer sued to cancel the Defendant's trademark, Snob, for perfume. The evidence showed that the Plaintiff wished to make a bona fide commercial use of Snob for perfume in the United States and that although the Defendant had owned the trademark for twenty years, it had made only 89 sales of Snob perfume in the United States. The Court cancelled the Defendant's trademark on the ground that it had never made a good faith commercial effort to exploit Snob. It stated "It is important to note expressly that the balance of equities plays an important role in deciding whether the defendant's use is sufficient to warrant trademark protection." *Id.* at 1274.

Subsequent to the *Snob* decision other courts have struck down trademark maintenance programs on a balance of the equities. In *Proctor & Gamble v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185 (S.D.N.Y. 1979), a New York district court found Proctor and Gamble's token use program to reserve SURE as a trademark for tampons ineffective to prevent a competitor's use of ASSURE for tampons. The court observed that the suit was really intended not to protect the non-existent good will in SURE as a trademark for tampons, but to benefit Proctor & Gamble's RELY tampon sales. By its suit Proctor and Gamble sought to force its competitor to withdraw its ASSURE tampon, which was one of RELY tampon's strongest competitors, from the market. *See also, Anvil Brands v. Consolidated Foods Corp., supra; Cf. Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260 (5th Cir. 1975).

The rationale underlying these token use cases is sound. Where a company seeks to acquire and maintain a trademark by token use alone, competitive fairness requires that a party not exclude a competitor from using an attractive mark unless that party has actually created good will in that mark. Moreover, setting aside a trademark acquired by token use results in no public confusion because no good will ever attached to the mark.

The case before the Court is distinguishable. Unlike the trademarks before the courts in *Snob* and *Proctor & Gamble*, "HUMBLE" was used for over half a century and amassed enormous good will, a significant amount of which remains today. There is no reason of competitive fairness for finding an abandonment in this situation. "HUMBLE" is an arbitrary mark that is attractive to the Defendant only because it represents an enormous residual good will belonging to the Plaintiffs. The Defendant is free to create its own arbitrary trademark. The Plaintiffs on the other hand have a legitimate interest in preventing the Defendant from trading on their reputation. Furthermore, the public interest requires that the Defendant not be permitted to use Humble because such use cannot be made without causing public confusion.

Support for drawing this distinction can be found in the decisions of the Trademark Trial and Appeals Board. The Board has taken the position in registration and cancellation proceedings that as long as a significant residual good will exists in a trademark, an abandonment cannot occur as a matter of law. *See, e. g., American Motors Corp. v. Action-Age, Inc.*, 178 U.S.P.Q. 377 (T.T.A.B. 1973); *Lyon Metal Products, Inc. v. Lyon, Inc.*, 134 U.S.P.Q. 31 (T.T.A.B. 1962).

Further support for finding no abandonment of "HUMBLE" in this case can be found in the *Restatement of Torts* § 752, comment b (1938):

b. *Cessation with intention to abandon.* Though one having a trade-mark or trade

name discontinues its use with the intention of abandoning it, he does not thereby authorize others to market their goods or services as his. If the trade-mark or trade name has considerable market reputation, it may continue for sometime after the cessation of the use to be regarded in the market as identifying the goods, services, or business of the person who discontinued the use. If he remains in business during that period, he is entitled to relief, under the rules stated in this topic against others who use the trade-mark or trade name in a manner which thus confuses prospective customers.

The Court finds that a significant residual good will exists in Plaintiffs' trademark. In that circumstance the intentional use of that trademark in commerce for protective purposes is a good faith use sufficient to preclude a loss of trademark rights.

The Court concludes that the Plaintiffs have not abandoned their rights in "HUM-, BLE."

C. The Laches and Acquiescence Defense

The Defendant contends that the Plaintiffs are guilty of laches and are therefore not entitled to have their trademarks and trade name protected. Defendant asserts that the Plaintiffs knew of and acquiesced in its use of Humble.

 Both laches and acquiescence can be a defense to trademark infringement. For the defense of laches to lie it is necessary that the evidence show (1) that there was a substantial delay in bringing the action; (2) that the Defendant was lulled into a false sense of security by the delay; and (3) the Defendant acted in reliance thereon to his detriment. *Whitman v. Disney Productions, Inc.*, 263 F.2d 229 (9th Cir. 1958). As distinct from laches, acquiescence constitutes a defense only upon a finding of conduct on the Plaintiff's part that amounted to an assurance to the Defendant express or implied, that the Plaintiff would not assert his trademark rights against the Defendant. *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss Jena*, 293 F.Supp. 892 (S.D.N.Y.1968). Only in the most exceptional circumstances will injunctive relief be denied in a case of deliberate infringement. *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609 (7th Cir. 1965).

 The evidence does not support the Defendant's defense of laches or acquiescence. Prior to January 11, 1977, the date that the Plaintiffs demanded that the Defendant cease its use of Humble, the Defendant's activities were limited to making a few passive investments for friends and clients in the oil operations of others. It was not until after the filing of this lawsuit that the Defendant began to do business as an exploration company in its own right. Thus, the Court concludes that the Defendant did not change positions in reliance on the Plaintiffs' delay in discovering and prosecuting their rights to "HUMBLE." Moreover, any good will that was amassed by the Defendant between 1974 and 1977 was negligible given the limited nature of its business. Thus, the Court finds no prejudice to the Defendant.

## CONCLUSION

The Court concludes that the Defendant's trade name Humble infringes the Plaintiffs' federal trademark "HUMBLE," and its registered variants in violation of § 1114(1) of the Lanham Act. The Court further concludes that the Defendant's trade name Humble infringes the Plaintiffs' common law trademark and trade name "HUMBLE," and as such, it constitutes a misrepresentation of goods and services in commerce in violation of § 1125(a) of the Lanham Act. The Court does not find that the Plaintiffs abandoned their rights in "HUMBLE" or that their right to assert their trademark rights is barred by laches and acquiescence. The Court therefore ORDERS that the Defendant's use of Humble as a trade name in connection with its activities be, and hereby is, enjoined.